# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| J.S.R., by and through his next friend, Joshua Perry,<br><br>Plaintiff-Petitioner,<br><br>v.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, et al.,<br><br>Defendants-Respondents. | Case No. 3:18-cv-01106-VAB<br><br>Motions Hearing: 11:30 a.m, July 11, 2018 |
| V.F.B., by and through her next friend, Joshua Perry,<br><br>Plaintiff-Petitioner,<br><br>v.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, et al.,<br><br>Defendants-Respondents. | Case No. 3:18-cv-01110-VAB<br><br>Motions Hearing: 3:30 p.m., July 11, 2018<br><br>Dated: July 5, 2018 |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

Amit Jain, Law Graduate
Aseem Mehta, Law Student Intern[*]
Carolyn O'Connor, Law Student Intern[*]
Hannah Schoen, Law Student Intern[*]
Muneer I. Ahmad (ct28109)
Marisol Orihuela[**]
Reena Parikh[†]
Michael J. Wishnie (ct27221)
Jerome N. Frank Legal Svcs. Org.
Yale Law School
127 Wall Street
New Haven, CT 06511
203-432-4800
muneer.ahmad@ylsclinics.org
marisol.orihuela@ylsclinics.org
michael.wishnie@ylsclinics.org

Joanne Lewis (ct06541)
Joshua Perry[†]
Connecticut Legal Services, Inc.
16 Main Street
New Britain, CT 06051
860-357-9302
jlewis@connlegalservices.org
jperry@connlegalservices.org

[*] *motion for law student appearance forthcoming*
[**] *motion for admission pending*
[†] *motion for admission forthcoming*
*Counsel for Plaintiff-Petitioners*

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................ 2

   I.    Detention, Family Separation, and Resulting Trauma of Plaintiff J.S.R. .................... 2

   II.   Detention, Family Separation, and Resulting Trauma of Plaintiff V.F.B................ 4

   III.  The Government's Policy of Forced Family Separation ................................ 5

LEGAL STANDARD ............................................................................................... 9

ARGUMENT ........................................................................................................... 10

   I.    J.S.R. and V.F.B.'s Prolonged and Forced Separation from Their Parents Violates Both Substantive and Procedural Due Process ................................ 10

      A.    J.S.R. and V.F.B. have a protected liberty interest in family reunification............... 10

      B.    Defendants' forcible separation of J.S.R. and V.F.B. from their parents violates substantive due process because it does not further any legitimate government interest......11

      C.    J.S.R. and V.F.B. are likely to succeed on their claim that Defendants violated their procedural due process rights by forcibly separating them from their parents without notice or an opportunity to be heard.. ............................................................... 13

   II.   By Separating J.S.R. and V.F.B. from Their Parents and Detaining J.S.R. and V.F.B. Thousands of Miles Away, Defendants Are Illegally Denying Them Equal Access to the Asylum Process on the Basis of Their Disabilities, in Violation of the Rehabilitation Act of 1973. ................................................................................. 15

      A.    J.S.R. and V.F.B. have disabilities under the Rehabilitation Act and are otherwise qualified for services sought... ............................................................... 16

      B.    Defendants are subject to Section 504……………………………………………17

      C.    J.S.R. and V.F.B. were denied services solely as a reason of their disability.  ......... 17

   III.  Defendants' Forcible Separation of J.S.R. and V.F.B. from Their Parents is Arbitrary and Capricious ............................................................... 19

      A.    Defendants' forcible separation of J.S.R. and V.F.B. from their parents constitutes final agency action. ................................................................................. 20

      B.    Defendants' separation of J.S.R. and V.F.B. from their parents is arbitrary and capricious. ................................................................................. 21

   IV.  Defendants' Discriminatory and Animus-Driven Separation of J.S.R., V.F.B., and Other Central American Children from Their Parents Violates Equal Protection ......... 23

   V.    J.S.R. and V.F.B. Satisfy the Other Requirements to Obtain Preliminary Relief . 28

      A.    J.S.R. and V.F.B. have suffered, and will continue to suffer, irreparable harm until they are reunited with their parents and released from detention. ................................ 28

      B.    The balance of hardships and the public interest weigh heavily in favor of preliminary relief………………………………………………………………………...32

CONCLUSION ....................................................................................................... 33

## INTRODUCTION[1]

Forty-nine days ago, the U.S. government forcibly separated fourteen-year-old Plaintiff V.F.B. from her mother, transferred her thousands of miles away to a government-funded shelter in Connecticut, and kept parent and child virtually incommunicado. Twenty-four days ago, the government forcibly separated nine-year-old Plaintiff J.S.R. from his father, transferred the child to the same shelter in Connecticut, and prevented their communication. In both cases, the children and their parents fled persecution in their home countries, only to be detained by the government upon their arrival in the United States, and then subjected to the unspeakable cruelty of forced and prolonged, family separation—all part of a government scheme known as the "zero tolerance policy." Immigration officials executed these separations through lies and deception: they took J.S.R.'s father away from him while the child was sleeping, and they lured V.F.B. away to take a shower, only to discover that her mother was gone when she returned. This outrageous government conduct has traumatized both children, and that trauma is compounded by their continued detention and separation from their parents. Plaintiffs therefore seek this Court's immediate intervention to stop the irreparable harm that continues to accrue with every passing day.

Defendants' forced and ongoing separation of J.S.R. and V.F.B. from their parents violates the children's Fifth Amendment rights to liberty and family unity; impairs their rights to equally participate in the life-or-death asylum process, in violation of the Rehabilitation Act of 1973; violates the Administrative Procedure Act; and is racially discriminatory, in violation of J.S.R. and V.F.B.'s equal protection rights. Because Plaintiffs are likely to prevail on the merits of these

---

[1] These two related cases have not been consolidated, but Petitioners J.S.R. and V.F.B., both appearing through next friend Joshua Perry and represented by identical counsel, submit this single brief in support of their respective motion for a temporary restraining order or preliminary injunctive relief. The identical brief is filed in both dockets for the convenience of the Court.

claims, they are irreparably harmed in the absence of the Court's intervention, and the balance of the equities and the public interest tip strongly in Plaintiffs' favor, the Court should issue a temporary restraining order, or, in the alternative, a preliminary injunction that: (1) enjoins Defendants from continuing to detain Plaintiffs J.S.R. or V.F.B., maintaining their separation from their parents, or delaying release to suitable sponsors; and (2) after parent and child confer, orders Defendants to release J.S.R. or V.F.B. by July 13, 2018 to a suitable sponsor or to reunite with their respective parents, as directed by the Plaintiffs.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I.     Detention, Family Separation, and Resulting Trauma of Plaintiff J.S.R.

Plaintiff-Petitioner J.S.R. is a nine-year-old boy and a citizen of Honduras. He has now been in the custody of the federal government for nearly a month.

Prior to arriving in the United States, J.S.R. lived in Honduras with his father, J.S.G.[2] J.S.R. and J.S.G. ultimately fled Honduras together because J.S.G. feared for his life and his son's life, after J.S.R.'s grandparents were murdered and a body of a family friend was left dead in the family's backyard. Declaration of Andrés Martin re. J.S.R. ("Martin Decl. A") ¶ 16.

To seek refuge and protection, J.S.R. and J.S.G. entered the United States on or around June 11, 2018 near Hidalgo, Texas. Declaration of Marisol Orihuela ("Orihuela Decl.") Ex. A. They were held in freezing conditions near the border, Declaration of Andrés Martin re. J.S.R. ("Martin Decl. A") ¶ 17, and placed into expedited removal hearings. Declaration of Massiel Zucco-Himmelstein ("Zucco-Himmelstein Decl.") Ex. A. J.S.G. expressed a fear to return to Honduras to a federal immigration official. Zucco-Himmelstein Decl. ¶ 12.

---

[2] Plaintiffs refer to J.S.R.'s father by his initial, J.S.G, to protect J.S.R.'s privacy, and because counsel has been able to contact him to gain his consent to be publicly named.

Shortly after J.S.R. and his father arrived in the U.S., they were confined by federal officials in freezing conditions.  J.S.R. was kept in a room that he recalls was cold and separate from where his father was being kept, but he observed his father shivering from being kept in what he described as a "hielera" -- a freezer or meat-locker. Zucco-Himmelstein Decl. ¶ 13. Defendants subsequently transferred J.S.G. and J.S.R. to an immigration detention center.  Martin Decl. A ¶ 17. On or about June 11, J.S.R. lay down to go to sleep.  When he awoke, his father was gone.  J.S.R. has not seen his father since.  Zucco-Himmelstein Decl. ¶ 14. J.S.R. did not have an opportunity to say goodbye to his father and had little understanding of why his father was taken away from him. Martin Decl. A ¶ 17.

After Defendants took J.S.R.'s father away from him, he was kept in cages with no windows with other young children for approximately four. Martin Decl. A ¶ 18. J.S.R. cried constantly for his father. He recalls children around him crying as well. *Id.* On or around June 16, 2018, J.S.R. was transferred to the custody of Defendant Office of Refugee Resettlement ("ORR") and detained at Noank Community Support Services, Inc. ("Noank"), an organization based in Groton, Connecticut that contracts to house children in federal custody. Zucco-Himmelstein Decl. ¶¶ 4, 17-18. J.S.R. is currently still detained at Noank, over 2000 miles away from where his father is detained at Port Isabel Service Detention Center in Los Fresnos, Texas. *Id.* ¶ 20.

J.S.R. has no relatives in Connecticut and during the approximately three weeks that he has been separated from his father, he has only been able to speak with his father twice. *Id.* ¶¶ 22, 24. J.S.R. does not sleep at night because he feels he must remain vigilant. Martin Decl. A ¶ 20. Moreover, he experiences the effects of the forcible separation of his father all day, every day. J.S.R. does not trust adults and is depressed and tearful. *Id*. His father was the individual who helped J.S.R. cope with the trauma resulting from his childhood filled with exposure to

violence and loss. *Id.* ¶ 21. Child psychiatrists have diagnosed J.S.R. with post-traumatic stress disorder "triggered by the acute trauma of forcible separation from his father. *Id.* J.S.R. scored a 38 out of 51 on the Child PTSD Symptom Scale, well above the cutoff of 15 requires for a diagnosis of PTSD. *Id.* ¶ 19. Moreover, the enforced, prolonged detention and painful separation from his father creates a real and substantial risk of long-term and irreversible physiological, developmental and psychological damage for J.S.R., include lifelong anxiety disorders; mood disorders, including depression; and physical illness stemming from trauma and stress. *Id.* ¶ 22.

**II.     Detention, Family Separation, and Resulting Trauma of Plaintiff V.F.B.**

Plaintiff-Petitioner V.F.B. is a fourteen-year-old girl and a citizen of El Salvador. She has now been in Defendants' custody for approximately seven weeks. Zucco-Himmelstein Decl. ¶ 36.

Prior to arriving in the United States, V.F.B. lived with her mother, siblings, and stepfather. Vicky's stepfather was killed by a gang, when he defied the gang by refusing to lend them his scooter. Declaration of Andrés Martin re. V.F.B. ("Martin Decl. B.")  ¶ 10. V.F.B. and her mother ultimately fled for fear that the gangs would kill them as well and because of the failure of the government to protect them. *Id.*

To seek refuge and protection, V.F.B. and her mother entered the United States in mid-May, 2018. They were placed held in freezing conditions near the border and placed in removal proceedings. *Id.*

At first, V.F.B. and her mother were detained at a CBP facility which V.F.B. called "hielera" – a freezer in Spanish. While in custody there, V.F.B. was taken to shower by government officials and when she returned, her mother was gone. Martin Decl. B ¶ 11. V.F.B. has not seen her in the nearly two months since that day. *Id.*

After V.F.B.'s mother was taken away from her, V.F.B. did not have an opportunity to say goodbye, did not understand why her mother was taken from her, and did not learn where her mother was for more than a month. Martin Decl. B. ¶ 11. V.F.B. has only spoken to her mother one time since their forced separation and during the mere ten-minute call, V.F.B. and her mother could do little more than cry so did not have a chance to meaningfully communicate. Martin Decl. B. ¶ 11; Zucco-Himmelstein Decl. ¶ 37.

On or around May 16, 2018, V.F.B. was transferred to ORR custody and detained at Noank. Zucco-Himmelstein Decl. ¶ 36.  V.F.B. is currently still detained at Noank, over 2000 miles away from where her mother is detained at LaSalle County Regional Detention Center in Encinal, Texas. *Id*. Upon psychiatric evaluation while in Noank, V.F.B. was diagnosed with PTSD, precipitated by being forcibly separated from her mother upon arrival in the U.S. Martin Decl. B. ¶¶ 7-8. The murder of V.F.B.'s stepfather was a defining trauma in her life, and when her mother was taken from her, V.F.B. effectively relived the loss of a caregiver, even more so because V.F.B's mother had helped her to cope with the prior trauma and was the most important person in her life. Martin Decl. B. ¶ 13. V.F.B.'s enforced, prolonged detention and painful separation from her mother creates a real and substantial risk of long-term and irreversible physiological, developmental and psychological damage for her. *Id.* ¶ 14.

### III.    The Government's Policy of Forced Family Separation

Defendants' forced and prolonged separation of J.S.R. and V.F.B. from their respective parents is the product of the government's "zero tolerance policy," a policy expressly designed to deter future asylum-seekers from coming to the United States by subjecting them to criminal prosecution and separation from their children. In March 2017, then-DHS Secretary John Kelly stated that the government was considering separating arriving children from their parents "in

order to deter more movement" into the United States. *See* Orihuela Decl. Ex. G. On May 7, 2018, Defendant Attorney General Jefferson Sessions announced the "zero tolerance policy" of prosecution of all asylum seekers and other migrants entering the country without inspection and coercive family separation of parents and children in order to deter asylum seekers and other migrants from crossing into the United States. Defendant Sessions explained, "If you cross this border unlawfully, then we will prosecute you. It's that simple. . . . If you are smuggling a child, then we will prosecute you and that child will be separated from you . . . ." Orihuela Decl. Ex. F.

Despite Defendant Sessions's reference to child smuggling, the government applied its "zero-tolerance policy" against parents who crossed the border with their own children seeking asylum, including J.S.R and V.F.B. The policy, by design, targeted only those family units crossing the southern U.S. border, not families entering the U.S. by other means, virtually all of whom are Latino, and a growing share of whom have origins in the "Northern Triangle" countries of Honduras (like J.S.R.), El Salvador (like V.F.B.), and Guatemala.[3] Defendants have forcibly separated over 2,300 children from their parents while crossing the border, some only months old. Orihuela Decl. Ex. H. Children forcibly separated from their parents were transferred to the custody of Defendant Office of Refugee Resettlement ("ORR"), a component of Defendant U.S. Department of Health and Human Services, and sent to shelters and temporary housing. ORR deems these children as "unaccompanied minors" and processes them as such, despite the fact they were accompanied to the U.S. by a parent who is still present in the U.S.. Orihuela Decl. Ex. I. Under ORR policies, a child will be released from ORR custody only after ORR undertakes an

---

[3] Orihuela Decl. Ex. E. (showing that the number of family units apprehended from Mexico dropped by half from FY 2016 to FY 2017, while the number of apprehended families from Guatemala, and Honduras increased by several thousand units. In addition, this data shows that, from FY 2013 to FYTD 2018, the rate of apprehended Mexican unaccompanied children has dropped from 45% of all unaccompanied apprehensions to 21%.).

onerous and lengthy procedure to determine that a potential custodian, or "sponsor," is suitable for providing for the child's physical and mental well-being. Orihuela Decl. Ex. J.

In the face of widespread public condemnation of coerced family separation, President Trump purportedly retracted the "zero tolerance policy" by Executive Order on June 20, 2018. Orihuela Decl. Ex. K. The EO continued the policy of initiating criminal proceedings for all individuals who crossed the border without authorization; however, in place of systematic separation of families, the EO called for indefinite detention of families in camps and makeshift facilities. *Id.* The EO did not include any provisions to reunite families that had been separated at the border, nor did it purport to remediate the trauma or other harms caused by family separation.

In litigation in the U.S. District Court for the Southern District of California, representatives for Defendant Immigration and Customs Enforcement ("ICE") did not dispute that they had "no plans or procedures to reunify the parent with the child other than arranging for them to be deported together after the parent's immigration case is concluded." *Ms. L. v. ICE*, __ F. Supp. 3d __, 2018 WL 3129486, at *5 (S.D. Cal. June 26, 2018) (internal quotations omitted). The court found that "under the present system migrant children are not accounted for with the same efficiency and accuracy as property." Id. at *7 (emphasis in original).

The court in *Ms. L.* ordered, *inter alia,* that the government reunify all class members[4] with their minor children age five and older by July 26, 2018 and take all steps necessary to facilitate regular communication between a detained parent and child.  However, the court did not itself

---

[4] The class was defined as "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child," and subject to additional carveouts for migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to the EO. Orihuela Decl. Ex. NN.

require the government to release any parent or child from federal custody. More importantly, the *Ms. L* Class was not comprised of detained children, and as such, the court order did not address any issues relating to the release of children from federal custody altogether; any process to involve the parent in decisions regarding placement of their child; or any process for expediting release of children to relatives or other caretakers where the parent together with the child determines that is in the best interest of the child. Moreover, in the case of Plaintiffs, the government has failed to take all steps necessary to facilitate regular communication between the detained children and their respective parent, as ordered by the court in *Ms. L.* Zucco-Himmelstein Decl. ¶¶ 22, 37.

The government's implementation of its "zero-tolerance policy" followed months of racially charged comments by Trump administration officials, including the President himself, against Latinos, individuals of Hispanic and Central American origin, and individuals from other non-European or non-White-majority populated countries.  On the first day of his presidential campaign, candidate Trump stated: "When Mexico sends its people, they're not sending their best … They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people." Orihuela Decl. Ex. L. Since taking office, President Trump has consistently pursued immigration policies against non-European immigrants. In summer 2017, he stated that the 15,000 Haitians admitted to the United States "all have AIDS," and expressed concern that Nigerian nationals in the United States would never "go back to their huts" in Africa. Orihuela Decl. Ex. M.

In January 2018, President Trump complained about proposed legislative protections for individuals from specific Central American and African countries, asking why the United States was admitting "all these people from shithole countries," as opposed to countries like Norway. *Id.* In May 2018, President Trump characterized certain unauthorized migrants as "animals." Orihuela Decl. Ex. N. The next month, defending his coerced family separation policy, the President alleged

that families crossing the border with their children "could be murderers and thieves and so much else," and warned that "[t]he United States will not be a migrant camp. . . ." *Id.* The President has further stated his desire to strip asylum seekers of due process rights and access to court: "We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came." Orihuela Decl. Ex. O.

The government has repeatedly changed its justification for the family separation policy. President Trump asserted that family separation was required under an unspecified law, Orihuela Decl. Ex. P, and then unilaterally ended the policy through an executive order. Orihuela Decl. Ex. K. DHS Secretary Kirstjen Nielsen claimed that the policy was necessary due to arriving adults and children fraudulently claiming to be family units, but less than one percent of families apprehended at the border made such fraudulent claims. Orihuela Decl. Ex. Q. And although President Trump asserted that 80 percent of individuals who were released pending immigration hearings failed to appear, most such individuals do in fact appear for their immigration hearings. Orihuela Decl. Ex. R.

## LEGAL STANDARD

Preliminary injunctive relief is warranted where plaintiffs establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) an injunction is "in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The standard for granting a preliminary injunction and a temporary restraining order pursuant to Rule 65 of the Federal Rules

of Civil Procedure is identical. *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F.Supp.2d 577, 580 (S.D.N.Y. 2002).

## ARGUMENT

J.S.R. and V.F.B. are entitled to emergency interim relief. J.S.R. and V.F.B. are likely to succeed on the merits of their four claims. First, Defendants' forcible separation of J.S.R. and V.F.B. from their parents violates the children's rights to Due Process under the Fifth Amendment, both substantively in maintaining family integrity and procedurally by failure to provide meaningful process prior to the separation. Second, Defendants' separation of the children unlawfully denies J.S.R. and V.F.B. from having equal access to the asylum program, and constitutes disability discrimination under the Rehabilitation Act. Third, Defendants have publicly justified their decision with pretextual reasons, when their actual rationale is an unlawful one, and they failed to consider relevant factors in separating J.S.R. and V.F.B. from their parents, thereby violating the Administrative Procedure Act. Fourth, and finally, these separations were driven by ethnic and racial animus, violating the equal protection that should be enjoyed by all children who seek shelter and refuge in the United States. Because the children are likely to succeed on the merits on these four claims, and because the remaining applicable factors weigh in favor of Plaintiffs, this Court should grant J.S.R. and V.F.B. a temporary restraining order or, in the alternative, preliminary injunctive relief.

## I.     J.S.R. and V.F.B.'s Prolonged and Forced Separation from Their Parents Violates Both Substantive and Procedural Due Process

### A.   J.S.R. and V.F.B. have a protected liberty interest in family reunification.

J.S.R. and V.F.B. are both protected under the Due Process Clause of the Fifth Amendment, which, by its own terms, applies to any "person" in the United States, including all noncitizens. *See Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is

unlawful, involuntary, or transitory is entitled to that constitutional protection."); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (explaining that "all persons within the territory of the United States are entitled to the protection" of the Due Process Clause).[5] Further, J.S.R. and V.F.B. have a protected liberty interest in being reunited with their parents. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (there is "a fundamental liberty interest" in children being under the care, custody, and management of their natural parents); *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (Choices about family life are "'of basic importance in our society,' ... rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect.") (quoting *M.L.B. v. S.L.J.,* 519 U.S. 102, 116, 117 (1996)); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) ("[T]he most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state."); *J.B. v. Washington County*, 127 3d 919 (10th Cir. 1997) ("[T]he forced separation of parent from children, even for a short time, represents a serious impingement upon both parents' and child's rights) (internal citations omitted) (citing *Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994)).

B. Defendants' forcible separation of J.S.R. and V.F.B. from their parents violates substantive due process because it does not further any legitimate government interest.

The federal government's forcible separation of J.S.R. and V.F.B. from their parents violates substantive due process because the government lacks any legitimate, let alone

---

[5] The manner of an individual's entry does not affect their due process protections once they are physically present in the country. *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."); *Zadvydas v. Davis,* 533.U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

compelling, interest in the separation of these children from their families. Due process forbids the government from separating parents and their children unless there is a case-specific determination that separation is in the best interests of the child – as, for instance, when the child is in danger or the parent is shown to be unfit. *See Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) (family-integrity interest "is counterbalanced by the compelling governmental interest in the protection of minor children"); *United States v. Loy*, 237 F.3d 251, 269-70 (3d Cir. 2001) ("[W]here there is insufficient evidence to support a finding that children are potentially in danger from their parents, the state's interest cannot be said to be 'compelling,' and thus interference in the family relationship is unconstitutional."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("[T]he Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family . . . without some showing of unfitness and for the *sole reason* that to do so was thought to be in the children's best interest.").

Despite the long-standing prohibition on family separation, Defendants have made no case-specific determination that would justify separating either J.S.R. or V.F.B. from their parents for three weeks and seven weeks, respectively. Nor could they: Every piece of available evidence indicates that J.S.R. and V.S.B.'s parents are loving caregivers upon whom the children rely for comfort, support, and guidance. Both children have been distraught since being separated from their respective parents. Martin Decl. A. ¶ 20; Martin Decl. B. ¶ 14; Zucco-Himmelstein Decl. ¶¶ 22, 38. Indeed, by causing significant and on-going trauma by separating the children from parents with whom both children have strong and loving connections, Martin. Decl. A ¶ 21; Martin Decl. B ¶ 14, Defendants are doing the very thing that justifies taking children away from a custodian – causing harm to the child. As such, the government lacks a proper justification for the ongoing separation of J.S.R. and V.F.B. from their parents.

Defendants' lack of a legitimate – much less compelling – interest in separating J.S.R and V.S.B. from their parents is evidenced by the shifting and pretextual rationales offered in support of its categorical separation policy of families seeking asylum. Defendants have changed public positions on their "zero tolerance policy" at least fourteen times in the past week, rationales which have been based on falsehoods or, at a minimum, factually-incorrect premises.[6] The shifting "reasons" for the separation policy mere scaffolding around the true motive of the policy, as explained by one of its architects, Senior Advisor to the President, Stephen Miller: asylum-seeking children are intentionally being traumatized for political gain.[7]

Shifting, pretextual, and at times truly troubling rationales are far from the required legitimate, compelling government interests to justify the on-going trauma to J.S.R. and V.F.B. and the injury to their substantive rights to family integrity. Because the government lacks sufficient justification for its actions, both children are likely to succeed on the merits of their substantive due process claim.

### C. J.S.R. and V.F.B. are likely to succeed on their claim that Defendants violated their procedural due process rights by forcibly separating them from their parents without notice or an opportunity to be heard.

Similarly, Plaintiffs are likely to succeed on their claim that Defendants have violated due process by forcibly separating these children from their parents without any – let alone the constitutionally-required – process that is due before families can be indefinitely split up. Because both Plaintiffs were constitutionally entitled to meaningful process before being torn from their parents, they are likely to succeed on the merits of their procedural due process claim.[8]

---

[6] Orihuela Decl. Ex. T.
[7] Orihuela Decl. Ex. GG.
[8] Procedural due process claims are analyzed under the familiar test set forth by *Mathews v. Eldridge*: the Court must balance the private interest affected by the government's action, the risk

Procedural due process requires a pre-deprivation hearing before the government may separate children from their parents. *See, e.g.*, *Stanley v. Illinois*, 405 U.S. 645, 658 (1972) (striking down state's presumption of unfitness for unmarried fathers, and holding that all parents "are constitutionally entitled to a hearing on their fitness before their children are removed from their custody"). Courts have recognized the enormous stakes of removing a child from the care of their parents and placing them into the custody of the state. "[C]hildhood is a particularly vulnerable time of life and children erroneously institutionalized during their formative years may bear the scars for the rest of their lives." *Parham v. J.R.*, 442 U.S. 584, 628 (1979) (Brennan, J., concurring in part and dissenting in part). For children, immigration detention and institutional custody apart for their parents are nearly identical to the detention that results from a delinquency adjudication. *See Flores v. Johnson*, No. 85-cv-4544-DMG (noting the federal government's failure to dispute evidence that its detention center "is a large block building" "designed to house adult male prisoners"). To avoid the grave consequences that flow from indefinitely placing a child into institutionalized custody, children, like J.S.R. and V.F.B., and their parents, must be afforded the opportunity to consider preferable alternatives in a pre-deprivation hearing.

Defendants' violations are far more egregious than the failure to provide sufficient pre-deprivation process to affected parties; Defendants failed to provide *any* process at all, before or after, tearing J.S.R. and V.F.B from their parents. At the *very least*, procedural due process requires affected parties be given notice and a set of procedural opportunities to protect their liberty interests. *Cf. Rivera v. Marcus*, 696 F.2d 1016, 1027-29 (2d Cir. 1982) (applying *Mathews* to hold foster parent specifically entitled to notice, opportunity to retain counsel, pre-removal hearing, and

---

of an erroneous deprivation and the probable value of additional safeguards, and the government's interest in more limited procedures. *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

robust rights at that hearing before state could terminate foster parent status). Here, where the government has ripped apart children from their parents and taken them thousands of miles away, an utter lack of process fails to provide J.S.R. and V.F.B. an "opportunity to be heard at a meaningful time and in a meaningful manner" before being forcibly separated from their parents. *Mathews*, 424 U.S. at 333. As such, J.S.R. and V.F.B. are likely to succeed on the merits of this claim.

## II. By Separating J.S.R. and V.F.B. from Their Parents and Detaining J.S.R. and V.F.B. Thousands of Miles Away, Defendants Are Illegally Denying Them Equal Access to the Asylum Process on the Basis of Their Disabilities, in Violation of the Rehabilitation Act of 1973.

Defendants' forcible separation and detention of two child asylum-seekers suffering from PTSD is also in violation of the Rehabilitation Act. Under Section 504 of that Act and DHS' implementing regulations, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). C.F.R. § 15.30. Both children suffer from trauma-related mental disabilities that are interfering with their meaningful access to the asylum and removal process, including communicating their desires for placement and their asylum claims to counsel and to immigration officials. The government's decision to forcibly separate J.S.R. and V.F.B. from their parents further limited the children's ability to access the program by removing the most crucial support the children need at this moment—their parents—and thereby is unlawfully denying them equal access to a federal program.

To state a claim under § 504, J.S.R. and V.F.B. must establish that: (1) they are qualified individuals with a disability; (2) one or more Defendants is subject to the Rehabilitation Act due

to being a program that receives extensive federal funding; and (3) Plaintiffs have been denied the opportunity to participate in or benefit from the Defendants' services, programs or activities, or were otherwise discriminated against by the Defendants because of their disability. *Wright v. New York State Department of Corrections*, 831 F.3d 64, 72 (2d. Cir. 2016) (internal quotations omitted).  *See also Disabled in Action v. Board of Elections in City of New York*, 752 F.3d 189, 196-97 (2d Cir. 2014).

A.  J.S.R. and V.F.B. have disabilities under the Rehabilitation Act and are otherwise qualified for services sought.

J.S.R. and V.F.B. both have a trauma-related disability: post-traumatic stress disorder (PTSD). Mental disabilities, including those due to trauma, qualify an individual for relief under both Section 504 and DHS's implementing regulations, 6 C.F.R. §§ 15.30, 15.50(b) by DHS. [9] *See also P.P. v. Compton United School District*, 135 F. Supp. 3d 1098 (C.D. Cal. 2015) (finding mental health disabilities related to "trauma" and "complex trauma" met the statutory requirement for a disability under the Rehabilitation Act); *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (holding that the Rehabilitation Act requires reasonable accommodations be provided for mental disabilities).

This long-recognized disability impairs both children's abilities to perform essential activities. J.S.R.'s condition places him in constant fear and keeps him from sleeping more than several hours a night: he experiences the loss of his father "all day, every day." Martin Decl. A, ¶ 20. He appears confused and anxious, is often crying, and as a result has trouble communicating with others. Zummo-Himmelstein Decl. ¶ 6-7. J.S.R. has scored more than twice the required score for PTSD on the Child PTSD Symptom Scale. Martin Decl. A ¶ 19.  V.F.B. also scored well above

---

[9] Disability is defined under 42 U.S.C. § 12102(1)(a) to include mental disabilities. A disability is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(1)(a).

the PTSD cutoff. Martin Decl. B ¶ 12. V.F.B.'s condition constricted her range of emotions every day, causing her to swing between tearful and distant. Martin V.F.B. Decl. B ¶ 8. Both J.S.R.'s and V.F.B.'s impairments impose a substantial limitation on a major life activity.

B.   Defendants are subject to Section 504.

The Rehabilitation Act applies to programs that receive federal financial support. *Dean v. Buffalo School of Medicine and Biomedical Sciences*, 804 F.3d 178, 186 (2d. Cir. 2015). DHS receives approximately $47 billion dollars in federal funding for FY 2018, the year in which both children tried to access DHS programs and services, including asylum screening administered by Defendants Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS). Orihuela Decl. Ex. U. The Department of Justice (DOJ) Executive Office for Immigration Review, which administers removal proceedings, received approximately $421 million in funding for FY 2017. *Id.* Ex. QQ. Defendant HHS received approximately $1.4 billion for its unaccompanied alien children program. *Id.* Ex. PP. This funding brings Defendants DHS, DOJ, HHS, and its components under the requirements of the Rehabilitation Act.

C.   J.S.R. and V.F.B. were denied services solely as a reason of their disability.

Defendants are denying J.S.R. and V.F.B. equal access to the asylum, removal, and sponsor placement processes solely on the basis of their disability. Qualified individuals can base their discrimination on "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation. *Tsombanidis v. West Haven Fire Dep't,* 352 F.3d 565, 573 (2d Cir. 2003). *See also Fulton v. Goord*, 591 F.3d 37, 43 (2d. Cir. 2009). Defendants' actions constitute disability discrimination on multiple grounds under the statute.

First, Defendants' are violating the Rehabilitation Act through their failure to provide J.S.R. and V.F.B. reasonable accommodations in the asylum, removal, and sponsor placement processes. As described above, both children face limitations in accessing these processes as a result of their disability. *See* Section II.A., *supra*. By separating them from their respective parents, Defendants have exacerbated their limitations, Martin Decl. A ¶ 21; Martin Decl. B ¶ 14, and thereby excluded them from the protections afforded by the asylum statutes and ORR's sponsor placement program. Furthermore, Defendants have failed to implement available and reasonable accommodations, such as reuniting the children with their parents and releasing them from detention. These accommodations would not "fundamentally alter" the service provided or "impose any undue financial or administrative burden," and therefore they are reasonable under the Act. *Disabled in Action v. Board of Elections in City of New York*, 752 F.3d 189, 197 (2d Cir. 2014) (internal quotations omitted).

Defendants have been on notice of Plaintiffs' request for reasonable accommodations, no later than the date of filing of the complaints in these lawsuits. Moreover, J.S.R. and V.F.B.'s trauma-related disabilities are clearly exhibited and the children have repeatedly and clearly expressed their desire to be with their respective parents. Despite this, Defendants have taken no steps to provide reasonable accommodations, including reuniting the children with their parents, to ensure the children can access asylum and immigration proceedings. Because Defendants have sufficient information to know about J.S.R.'s and V.F.B.'s disability and a desire for accommodation, and have failed to provide such accommodations, they are in violation of the Rehabilitation Act. *See Quadir v. New York State Dept. of Labor*, 39 F.Supp.3d 528, 540 (S.D.N.Y. 2014) (stating the agency only needs to have enough information to know of the disability and desire for accommodation); *Wilds v. U.S. Postmaster*, 989 F.Spp.179, 192 (D. Conn. 1997) (noting

that the purpose of exhaustion is to put the agency on notice to investigate, mediate, and take remedial actions).[10]

Second, Defendants' policy to subject J.S.R. and V.F.B., both asylum-seekers suffering from trauma-related disabilities, to categorical family separation constitutes discrimination under the Rehabilitation Act because it is either disparate treatment of, or at the very least has a disparate impact on, people with qualifying disabilities. J.S.R.'s and V.F.B.'s ability to participate in the asylum, removal, and sponsorship processes will undoubtedly involve critical decision-making, potential recounting of traumatic events, and other essential matters which are significantly affected by their disability. Defendants intentionally are preventing the children from turning to their parents for counsel and assistance in coping with, processing, and speaking about the experiences of violence, persecution, and loss that contributes to their disability and form the basis for their asylum claims. The policy forces both J.S.R. and V.F.B. to navigate the new and on-going trauma of separation alone, while leaving them without guidance in the face of critical decisions.

In light of the purpose of the Rehabilitation Act, and the government's failure to comply with its obligations under it, J.S.R. and V.F.B. are likely to succeed on the merits of their claim.

### III.   Defendants' Forcible Separation of J.S.R. and V.F.B. from Their Parents is Arbitrary and Capricious

Aside from violating J.S.R. and V.F.B.'s rights under the Due Process Clause and the Rehabilitation Act, Defendants' actions violate the Administrative Procedure Act (APA). The APA protects individuals from final agency action that is "arbitrary, capricious, or otherwise not

---

[10] Based on the high likelihood that children seeking asylum will suffer from trauma-related disabilities; the research and statements by organizations such as the American Academy of Pediatrics and the American Psychiatric Association on family separation; and the children's behavior, the agency had enough information to know of the disability and desire to have their parents present to help the children participate in the asylum and immigration process. *See* Orihuela Decl. Ex. V. In any case, at the very latest, Defendants were put on notice of the request for reasonable accommodations by this litigation and have made no accommodations since.

in accordance with law" by authorizing courts to enjoin such action. 5 U.S.C. § 706(2)(A); *Judulang v. Holder*, 565 U.S. 42, 52 (2011). Courts must ensure that an agency has given "adequate reasons for its decision[]." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 2125 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm, Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)). Where the agency has failed to provide an adequate explanation, the agency action must be set aside. 5 U.S.C. § 706(2)(A).

A. Defendants' forcible separation of J.S.R. and V.F.B. from their parents constitutes final agency action.

Defendants' forcible separation of J.S.R. and V.F.B. is a final agency action subject to review under the APA. 5 U.S.C. § 704. In order for an agency action to be reviewable, the action must represent the "consummation of the agency's decisionmaking process" and be one "by which rights or obligations have been determined." *U.S. Army Corps of Engineers v. Hawkes*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). The government's decision to separate J.S.R. and V.F.B. from their parents represents the consummation of its decisionmaking process. A consummation of decisionmaking process occurs when the action is "typically not revisited" as opposed to "advisory in nature." *Hawkes*, 136 S. Ct. at 1813-14. That is the case here. Far from issuing a mere advisory opinion that a family should be separated, the government actually effectuated separations of parent and child. It is impossible to find that the government's decision was "purely advisory" and "in no way affected the legal rights of the relevant actors." *Bennett*, 520 U.S. at 177-78. Rather, the government's decision to separate these

20

children from their primary caretakers has had a "direct and appreciable" impact on each child's right to family unity, among their most important and fundamental rights. *See supra* Section I.B.[11]

B.  Defendants' separation of J.S.R. and V.F.B. from their parents is arbitrary and capricious.

Defendants' separation of J.S.R. and V.F.B. from their parents is arbitrary and capricious for three reasons. First, the reasons Defendants provided were pretextual and therefore improper. Second, Defendants' true reason for separating the children from their parents – to deter asylum-seekers -- is unlawful and therefore impermissible. Finally, Defendants failed to consider all relevant factors, including the parent-child relationship, resulting trauma, and additional suffering.

First, Defendants have provided pretextual explanations for their actions. Pretextual justifications will not withstand arbitrary and capricious review. *See, e.g.*, *Aeronautical Radio, Inc. v. FCC*, 928 F.2d 428, 448 (D.C. Cir. 1991); *New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130-31 (D.C. Cir. 1984). Defendants' justifications for family separations have been shifting and have collapsed when subjected to any sort of scrutiny, demonstrating that these reasons are merely pretextual. For example, Defendant DHS Secretary Nielsen said that the "zero tolerance policy" aims to prevent adults and children from pretending they were family units. Orihuela Decl. Ex. Q. However, in reality, less than 1 percent of arriving individuals have pretended to be members of a family unit. *Id.* President Trump attempted to justify the policy as necessary because families were not attending their immigration proceedings. *Id.* However, prior to the start of the policy, 60-80 percent of families were attending their hearings.

---

[11] Defendants may argue that their decision to separate Plaintiffs from their parents is "merely tentative," since the government can reunite Plaintiffs and their parents at any time. But the government's ability to change its decision does not mean that its decision is not final. *See Hawkes*, 136 S. Ct. at 1813-14 (fact that decision could be revisited did not preclude a finding of final agency action). Here, Defendants have not indicated what steps if any they are taking to immediately release J.S.R. and V.F.B. and unite them to their parents or other suitable adult.

*Id.* Such pretextual justifications cannot pass arbitrary and capricious review. *See, e.g.*, *Aeronautical Radio, Inc.*, 928 F.2d at 448.

The true reason that Defendants separated families was to deter asylum seekers from Central and South America from coming to the United States. This purpose is arbitrary and capricious because it is unlawful. *See SEC v. Chenery Corp.* [hereinafter *Chenery I*], 318 U.S. 80, 94 (1943) (holding that "an order may not stand if the agency has misconceived the law"); *see also* Massachusetts v. EPA, 549 U.S. 497, 532, 534 (2007); *Yale–New Haven Hosp. v. Leavitt,* 470 F.3d 71, 86–87 (2d Cir. 2006). The Immigration and Nationality Act requires Defendants to allow those who meet the legal definition of "asylee" to present themselves at the border and apply for asylum. 8 U.S.C. § 1158(a)(1). Relatedly, if an Immigration Judge determines that an individual's life or freedom would be threatened in their country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion, the government is generally prohibited from removing the individual to that country.  8 U.S.C. § 1231(b)(3). Defendants' purpose of deterring individuals from exercising their lawful privileges is contrary to not only national law but also international law, including U. N. Treaty Obligations.  The United Nations, Convention and Protocol Relating to the Status of Refugees, (1951), *available at* http://www.unhcr.org/en-us/3b66c2aa10. Because Defendants' reasons are unlawful, Defendants' actions violate the APA and must be set aside.

Finally, Defendants' decision to separate J.S.R. and V.F.B. from their parents was arbitrary and capricious because Defendants failed to "consider[] all relevant issues and factors." *Long Island Head Start Child Dev. Servs. v. N.L.R.B.,* 460 F.3d 254, 258 (2d Cir. 2006); *see also State Farm*, 463 U.S. at 43 (holding that an agency action is arbitrary and capricious "if it entirely failed to consider an important aspect of the problem.") In deciding to separate J.S.R. and V.F.B. from

their parents, Defendants failed to consider several relevant factors, including: (1) the effect of parental separation and isolation on young children like J.S.R. and V.F.B and (2) the ongoing trauma that J.S.R. and V.F.B. endure as child refugees and how that trauma might be exacerbated by family separation. Since Defendants failed to consider "an important aspect of the problem," their decision is arbitrary and capricious and should be set aside.

### IV.    Defendants' Discriminatory and Animus-Driven Separation of J.S.R., V.F.B., and Other Central American Children from Their Parents Violates Equal Protection

While Defendants have repeatedly offered justifications for their "zero tolerance policy" that have proven false and pretextual, *see supra* Parts I.B & III.B, the architects of the policy have been consistent on one point: their repeated expressions of racial animus against individuals of Latino ethnicity. The Supreme Court has long recognized that the federal government is prohibited from racial discrimination. *Bolling v. Sharpe*, 347 U.S. 497, 498-500 (954). Because Defendants' policy of coerced family separation was both 1) applied in a discriminatory fashion against people of Latino ethnicity and 2) it was motivated by discriminatory animus against this group and its application results in a discriminatory effect, the policy violates the equal protection component of the Due Process Clause on these two separate grounds. Here, too, J.S.R. and V.F.B. can establish a likelihood of success on the merits.

As the Second Circuit has explained, unconstitutional discrimination by a government actor can be demonstrated in multiple ways:

> First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227-29 (1995). In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). Lastly, a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977).

23

*Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). Race and ethnicity are the paradigmatic suspect classifications, meaning that discrimination on the basis of either violates the Constitution in all but the narrowest circumstances. *E.g.*, *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013) (racial or ethnic categorizations are inherently suspect).

In the instant case, Defendants' coerced family separation policy, while facially neutral, violates equal protection for two reasons: (1) it was applied in a discriminatory fashion, and (2) it was motivated by discriminatory animus and resulted in a discriminatory effect.

A.   *The Policy's Discriminatory Application to Latinos.*

First, the policy was applied in a discriminatory fashion because, by design, it targeted only those family units crossing the southern U.S. border, a majority and growing share of whom have origins in the "Northern Triangle" countries of Honduras (like J.S.R.), El Salvador (like V.F.B.), and Guatemala, which comprise of Latino people.[12] Of those unaccompanied children who were apprehended at the Southern border, only 0.5% children were not from El Salvador, Guatemala, Honduras, or Mexico.[13] Of the family units apprehended, only 0.9% were not from one of these four countries.[14] Thus, the policy was directed at individuals of Latino ethnicity.[15]

B.   *The Policy has a Purpose Animated by Discriminatory Intent*

---

[12] Orihuela Decl. Ex. E. This data shows that the number of family units apprehended from Mexico dropped significantly from FY 2016 to FY 2017, while the number of apprehended families from Guatemala, and Honduras increased by several thousand units. In addition, this data shows that, from FY 2013 to FYTD 2018, the rate of apprehended Mexican unaccompanied children has dropped from being 45% of all unaccompanied apprehensions to 21%.). In fact, this website only lists the demographics for Hispanic asylum seekers in the tables about Southwest border apprehensions.

[13] *Id.*

[14] *Id.*

[15] Note that, while the affirmative asylum applications by migrants from Northern Triangle countries rose by 234% from FY 2014 to FY 2016, China remains the largest country for affirmative asylum applications. Only defensive asylum seekers are predominantly from these Northern Triangle countries. Orihuela Decl. Ex. HH.

Second, the consistently racialized statements of the president and his top advisers demonstrate that their family separation policy was motivated by animus, and the evidence shows that it resulted in a discriminatory effect. Discriminatory intent is "rarely susceptible to direct proof. . . ." *Hayden v. Paterson,* 594 F.3d 150, 163 (2d Cir. 2010) (quoting *Arlington Heights*, 429 U.S. at 265). While evidence of disparate impact alone may suffice to show discriminatory purpose, *Arlington Heights*, 429 U.S. at 266, courts in the Second Circuit have apply "the familiar *Arlington Heights* factors" determine whether a plaintiff challenging a facially neutral law has established a prima facie case of discriminatory purpose. *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (citing *Arlington Heights*, 429 U.S. 252 at 266-7). Relevant factors include the impact of the official action, whether there has been a clear pattern unexplainable on other grounds besides discrimination, the historical background of the decision, the specific sequence of events leading up to the challenged decision, and departures from the normal procedural sequence. Substantive departures may also be relevant "if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 266-7. "When there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Under these facts, Plaintiffs are likely to succeed on their equal protection claim. *Hayden*, 180 F.3d at 48; *Yick Wo*, 118 U.S. at 373-74.

First, the highest decisionmaker about refugee and asylum processes, President Trump, has repeatedly and consistently expressed animus against individuals of non-European race and

ethnicity, from the very first day of his presidential campaign[16] to recent weeks and months.[17] And since assuming office, the president has consistently pursued immigration policies motivated by racial animus against non-European immigrants. In the summer of 2017, President Trump stated that the 15,000 Haitians admitted to the United States "all have AIDS," and expressed concern that Nigerian nationals in the United States would never "go back to their huts" in Africa.[18] In January of 2018, President Trump complained about protections for noncitizens from Central America and Africa, asking why the United States was admitting "all these people from shithole countries" as opposed to countries like Norway.[19] The use racially charged language can be evidence that official action was motivated by unlawful discriminatory purposes, as is the case here. *See, e.g. Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999); *Smith v. Thornburg*, 136 F.3d 1070, 1089-90 (6th Cir. 1998); *Freeman v. Arpaio*, 125 F.3d 732, 738 n.6 (9th Cir. 1997), overruled in part on other grounds by *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008); *Ali v. Connick*, 136 F.Supp.3d 270, 279-80 (E.D.N.Y. 2015) (collecting cases). Moreover, *Arlington Heights* notes that "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," should be undertaken and statements by the official responsible for a challenged policy fall within this inquiry. *Arlington Heights*, 429 U.S. at 266.

Second, the specific sequence of events demonstrate that the family separation policy was a manifestation of the president's animus against Latinos. The policy followed the president's marked outrage over a caravan of Latino refugees, including families with children, approaching the southern U.S. border.[20] When the policy was publicly announced about one month later, senior

---

[16] Orihuela Decl. Ex. L.
[17] Orihuela Decl. Ex. Z.
[18] Orihuela Decl. Ex. AA.
[19] Orihuela Decl. Ex. II.
[20] Orihuela Decl. Ex. BB.

administration officials justified the severe act of separating children and parents on a deterrence rationale.[21] To explain the need for such deterrence, White House Chief of Staff John Kelly described the predominantly Latino individuals crossing the southern U.S. border as:

> . . . not people that would easily assimilate into the United States into our modern society. They're overwhelmingly rural people in the countries they come from—fourth, fifth, sixth grade educations are kind of the norm. They don't speak English, obviously that's a big thing. They don't speak English. They don't integrate well, they don't have skills.[22]

For his part, the president alleged without evidence that Latino families crossing the border with their children "could be murderers and thieves and so much else."[23]

Third, separating children from their family on the Southern border is a significant departure from normal procedure. First, the federal government has had a process to streamline prosecution of immigrants for entry charges since 2005; it has not led to immediately separating children from parents by thousands of miles and weeks.[24] In fact, Defendants have followed a practice for over a decade that has emphasized, sometimes too much so at times, detaining children with their families. *Flores v. Lynch,* 828 F.3d 898, 904 (9th Cir. 2016) (discussing how the *Flores* Settlement has been deemed to apply to children even when with their families, requiring the government to create a new approach to family detention).

Fourth, substantive factors would suggest would strongly favor a decision contrary to the one to prosecute all migrants to for a deterrence impact and to separate their children in order to achieve this goal. After almost thirteen years of implementation, there is no evidence that mass criminal prosecution approaches are an effective or efficient way to handle migration and instead

---

[21] Orihuela Decl. Ex. JJ.
[22] Orihuela Decl. Ex. JJ.
[23] Orihuela Decl. Ex. CC.
[24] Orihuela Decl. Ex. MM.

may risk unlawfully be inconsistent with the rights of asylum seekers.[25] Secondly, the government has already been enjoined from using deterrence as a factor in detention. *R.I.L.R. v. Johnson*, 2015 WL 800157 (D.D.C. 2015). Third, child separation has been recognized as causing significant trauma and long-term effects.[26] These factors combined would not suggest that the policy should be applied without further and significant study and protections in place, none of which were conducted here.

The significant, disparate impact on Hispanic asylum-seekers and the numerous factors that show the government is impermissibly discriminating on the basis of race and ethnicity all suggest that the *Arlington Heights* factors are clearly met, and the policy violated equal protection. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. at 266-7. As above, J.S.R. and V.F.B. have demonstrated that they are likely to succeed on the merits of their claims.

## V.     J.S.R. and V.F.B. Satisfy the Other Requirements to Obtain Interim Relief

### A.  J.S.R. and V.F.B. have suffered, and will continue to suffer, irreparable harm until they are reunited with their parents and released from detention.

Defendants have violated and—unless enjoined by this Court—will continue to violate the constitutional and statutory rights of J.S.R. and V.F.B. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (quotations and citation omitted); *accord Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

---

[25] Orihuela Decl. Ex. KK.
[26] Orihuela Decl. Ex. LL.

Yet the ongoing harms that Defendants are wreaking on young J.S.R. and V.F.B. go far beyond those that typically flow from rights violations, for three reasons. First, the trauma of family separation causes especially severe and irreparable injuries, particularly when inflicted upon vulnerable children like these. Thus, for example, the American Academy of Pediatrics has denounced Defendants' practice of separating children like Plaintiffs from their parents, explaining that the "[s]eparation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for [the] safety of the child at the hand of [the] parent."[27] Indeed, J.S.R. currently suffers from PTSD as a result of his forcible separation from his father, whom he views "as his protector and his hero." Martin Decl. A ¶ 16. With his father detained thousands of miles away, J.S.R. does not sleep well, distrusts adults, and is depressed and tearful. *Id.* ¶¶ 17, 20. V.F.B., too, developed PTSD after Defendants separated her from her mother. Martin Decl. B ¶¶ 12, 14-15. V.F.B.'s stepfather was murdered early into her adolescence, and Defendants' actions in taking V.F.B.'s mother away from her forced her to relive the loss of a caregiver. *Id.* ¶ 13.

In recognition of the unique vulnerabilities of children and the trauma of family separation, courts have held that separation of parents and children visits irreparable harm on both. *See, e.g.*, *McLaughlin v. Pernsley*, 876 F.2d 308, 315 (3d Cir. 1989) (holding that family separation causes irreparable harm because "the bonds between the [parents] and their foster child will weaken continuously with the passage of time apart"); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir. 1997) ("[F]orced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights.") (internal quotations removed); *Nicolson v. Pappalardo*, 685 F.Supp.2d 142, 145-46 (D. Me. 2010) (holding that "[e]very additional day" of separation causes further harm); *cf. Stanley v. Illinois*, 405 U.S. 645, 647 (1972) ("[P]etitioner

---

[27] Orihuela Decl. Ex. DD.

suffers from the deprivation of his children, and the children suffer from uncertainty and dislocation."); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) ("separation from family members" constitutes irreparable harm) (quotation marks omitted). Given the well-established facts about the trauma of separation generally, as well as the injuries demonstrated by J.S.R. and V.F.B. specifically, this Court should hold the same.

Second, continued detention of J.S.R. and V.F.B. is highly traumatic, given children's particular vulnerabilities. The stress of detention and uncertainty often leads to chronic illnesses and lasting impairments in children's intellectual and cognitive development.[28] International researchers have concluded that such harms can be inflicted even where detention of children is of limited duration.[29] Even the government's own guidelines on children's asylum claims emphasize that "[l]engthy confinement in refugee camps" can "greatly endanger the psychological well-being of children."[30] Given their vulnerabilities, J.S.R. and V.F.B. have already experienced irreparable harm from their unlawful detention, and this harm will continue to worsen with every minute they spend in Defendants' custody. Thus, an expert child psychiatrist diagnoses the "prolonged detention" of both J.S.R. and V.F.B. as an "immediate stressor" for both, and recommends their

---

[28] Orihuela Decl. Ex. EE (noting that trauma from detention can "stunt[] children's brain development, which affects essential cognitive functioning, problem-solving, emotional self-regulation, social cue reading, regressions in behaviors, attachment disorders, psychiatric problems, developmental delays, and chronic physical illnesses").

[29] Janet Cleveland, *Psychological Harm and the Case for Alternatives*, 44 FORCED MIGRATION REV. 7, 7 (Sept. 2013) (finding "striking" negative psychological impacts even where detention was "comparatively brief"); Rachel Kronick, Cécile Rousseau, & Janet Cleveland, *Asylum-Seeking Children's Experiences of Detention in Canada: A Qualitative Study*, 85 AM. J. ORTHOPSYCHIATRY 287, 291 (2015) ("Even very brief detention appears to be acutely distressing for children."); Amy Lorek et al., *The Mental and Physical Health Difficulties of Children Held Within a British Immigration Detention Center: A Pilot Study*, 33 CHILD ABUSE & NEGLECT 573, 581 (2009) ("This study's findings indicate that the experience of detention, even for a relatively brief period of time, has a detrimental effect on the mental and physical health of children.").

[30] Orihuela Decl. Ex. FF.

immediate release to "an environment of comfort and support—that is, in the community, rather than in a detention center." Martin Decl. A ¶ 23; Martin Decl. B ¶¶ 15-16.

Third, both the harms that J.S.R. and V.F.B. suffer from family separation and the harms that they suffer from prolonged detention are magnified by the other traumatic events that each has experienced, including the fact that they had to flee from their homes. Asylum-seekers and refugees are disproportionately likely to experience trauma-related conditions, even setting aside their treatment upon arrival.[31] J.S.R. and V.F.B. are no exception. In his short life thus far, J.S.R. has survived the murder of his grandparents, and he has seen his grandmother floating on a river with her throat slit. Martin Decl. A ¶ 16. Similarly, V.F.B. lost her beloved stepfather to a murder in 2017. Martin V.F.B. Decl. B ¶ 10. These children's trauma-related vulnerabilities underscore the gravity of the harms they are suffering, and will continue to suffer absent intervention by this Court.

Finally, the collateral *Ms. L* litigation in the Southern District of California will not suffice to provide J.S.R. and V.F.B. the relief to which they are entitled in this action, given the extent of the injuries they have suffered. J.S.R. and V.F.B. are not members of the *Ms. L* plaintiff class, which includes only "adult parents." Order Granting in Part Plaintiffs' Motion for Class Certification at 17, *Ms. L v. ICE*, No. 18-cv-0428 DMS (MDD) (S.D. Cal. filed Feb. 26, 2018). ECF No. 82. Thus, the instant Plaintiffs' interests as children are not represented in that case. Further, the relief ordered in that case—reunification of children with parents not in criminal

---

[31] *E.g.*, AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 465 (4th ed. 2000) (noting that those who "have recently emigrated from areas of considerable social unrest and civil conflict may have elevated rates of [PTSD]"); Jessica Chaudhary, *Memory and Its Implications for Asylum Decisions*, 6 J. HEALTH & BIOMED. L. 37, 50 (2010) ("Refugees are prone to particularly high levels of trauma and subsequent PTSD development by the very nature of their experiences.").

proceedings within 30 days of June 26, 2018, *see Ms. L v. ICE*, No. 18-cv-0428 DMS (MDD), 2018 WL 3129486, at *12 (S.D. Cal. June 26, 2018)—is insufficient to vindicate J.S.R. and V.F.B.'s rights to *immediate* reunification with their parents, nor does it address their rights to immediate release from detention. Last, even if J.S.R. and V.F.B. might benefit indirectly from the *Ms. L* preliminary injunction in the future, the government has not yet indicated whether it intends to appeal with that injunction or comply (and if so, how). Thus, this Court cannot rely on a separate proceeding to vindicate these children's statutory and constitutional rights, nor to staunch the continuing and irreparable harms they suffer.

> ### B.  The balance of hardships and the public interest weigh heavily in favor of preliminary relief.

The final requirements for a preliminary relief are that "the balance of equities tips in [the moving party's] favor, and that an injunction is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (citation omitted). Each of these tips sharply in favor of preliminary injunctive relief.

The balance of equities tips in favor of J.S.R. and V.F.B. because the relief requested would remedy significant violations of their rights while causing no injury to Defendants. "The Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government." *Sajous v. Decker*, 18-CV-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)). Even if further balancing were appropriate, the staggering harms described above and documented by a psychiatric expert far outweigh any administrative injury Defendants could plausibly claim to suffer.

Similarly, "the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld." *Id.* (citing *Mitchell*, 748 F.2d at 808). The public has no interest in continued, unlawful family separation and detention of J.S.R. and V.F.B., two traumatized children with bona fide asylum claims and suitable sponsors. Accordingly, this factor further militates in favor of the issuance of a preliminary injunction.

## CONCLUSION

J.S.R. and V.F.B., by and through their next friend, have demonstrated that each is likely to succeed on the merits of their claims, and that they are both suffering immensely—and will continue to suffer irreparable harm—if their detention, separation from primary caretakers, and unequal access to the U.S. asylum process continue. J.S.R. and V.F.B. have also established that the balance of equities and the public interest strongly support the issuance of a temporary restraining order or preliminary injunctive relief.

For the reasons set forth above, this Court should (1) enjoin defendants from continuing to detain or maintain custody over plaintiffs J.S.R. or V.F.B. separately from their parents or delaying release of their to suitable sponsors; (2) after parent and child confer, order Defendants to release J.S.R. or V.F.B. by July 13, 2018 to a suitable sponsor or to reunite with their respective parents, as directed by the plaintiffs.


Dated: July 5, 2018
New Haven, Connecticut

Respectfully submitted,

/s/ Muneer Ahmad

Amit Jain, Law Graduate                         Joanne Lewis (ct06541)
Aseem Mehta, Law Student Intern[*]              Joshua Perry[†]
Carolyn O'Connor, Law Student Intern[*]         Connecticut Legal Services, Inc.
Hannah Schoen, Law Student Intern[*]            16 Main Street

Muneer I. Ahmad (ct28109)                New Britain, CT 06051
Marisol Orihuela**                       860-357-9302
Reena Parikh†                            jlewis@connlegalservices.org
Michael J. Wishnie (ct27221)             jperry@connlegalservices.org
Jerome N. Frank Legal Svcs. Org.
Yale Law School††
127 Wall Street
New Haven, CT 06511
203-432-4800
muneer.ahmad@ylsclinics.org              *Counsel for Plaintiff-Petitioners*
marisol.orihuela@ylsclinics.org
reena.parikh@ylsclinics.org
michael.wishnie@ylsclinics.org

[*] Motion for law student appearance forthcoming.
[**] Motion for admission pending.
[†] Application for admission forthcoming.
[††] This brief has been prepared by a program affiliated with Yale Law School, but does not purport to present the school's institutional views, if any.

## CERTIFICATE OF SERVICE

I hereby certify that, on July 5, 2018, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of this court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

Date:   July 5, 2018

Respectfully submitted,

_/s/ Marisol Orihuela_____

Marisol Orihuela
Jerome N. Frank Legal Services
Organization
P.O. Box 209090
New Haven, CT 06520
P: (203) 432-4800
F: (203) 432-1426