UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


J.S.R., by and through his next     :
Friend Joshua Perry     :
         Plaintiff     :
    :
      v.     :     C.A. No. 3:18cv1106 (VAB)
    :
JEFFERSON B. SESSIONS, III, Attorney     :
General of the United States, et al     :

_____


V.F.B., by and through her next     :
Friend Joshua Perry     :
         Plaintiff     :
    :
      v.     :     C.A. No. 3:18cv1110 (VAB)
    :
JEFFERSON B. SESSIONS, III, Attorney     :
General of the United States, et al     :


## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION


## I.    INTRODUCTION

      Plaintiffs have filed a Motion for a Temporary Restraining Order or a Preliminary Injunction seeking reunification with their parents or release from custody to designated sponsors by July 13, 2018. The Plaintiffs' parents are class members in *Ms. L., et al v. ICE, et al*, Case No. 18-cv-0428 (S.D. Cal.), and are beneficiaries of the preliminary injunction order issued in that case which requires reunification of those Plaintiffs with their children – along with other separated families – by July 26, 2018. This Court should not allow Plaintiffs' individual claims for injunctive

relief to go forward in light of the existing class action because doing so would interfere with the orderly administration of the relief already granted in the pending class action. In addition, the Defendants cannot release Plaintiffs to sponsors. At the time of the filing of their Motion and this Objection, the Defendants have not received a sponsorship application for Plaintiff J.S.R. and only received an incomplete sponsorship application, on the evening of July 9, 2018, on behalf of Plaintiff V.F.B. [1]

As set forth below, the Defendants are working diligently to effectuate up to 3,000 reunifications on a very tight timeframe. Granting the relief sought by Plaintiffs could interfere with the Defendants' ongoing efforts to timely comply with the preliminary injunction order in *Ms. L.* Additionally, the Noank Community Support Services, Inc. ("Noank") is providing excellent care and services to Plaintiffs, including medical care and treatment. Indeed, as of the time of this filing, Plaintiffs, through counsel, have not requested any additional services or accommodations for Plaintiffs. [2]

## II.  FACTUAL BACKGROUND

### A.  Plaintiff J.S.R. and His Father ("J.S.G.")

J.S.G. is a native and citizen of Honduras. J.S.G. entered the United States with Plaintiff J.S.R., on or around June 11, 2018, and was encountered by the Rio Grande Valley, Texas Border Patrol Sector. At that time, Customs and Border Patrol ("CBP") determined that J.S.G. had a prior order of expedited removal dated April 21, 2017. J.S.G. was processed for reinstatement of that

---

[1] The sponsorship application received on the evening of July 9, 2018, did not contain a consent form signed by Plaintiff V.L.B.'s mother, which is need to support the application.

[2] If such requests are made prior to reunification, the Defendants will carefully consider each request and make every attempt to comply.

previous order of removal. On June 13, 2018, J.S.G. plead guilty to unlawfully entering the United States and was sentenced to time served. J.S.G. is currently awaiting travel papers for removal.

Plaintiff J.S.R. is a native and citizen of Honduras who entered the United States with J.S.G. on or around June 11, 2018. Plaintiff J.S.R. was processed as an Unaccompanied Alien Child ("UAC") and served a notice to appear, which has not yet been served on the Executive Office of Immigration Review ("EOIR"). Since June 13, 2018, Plaintiff J.S.R. has been housed by the Noank Community Support Services, Inc. ("Noank"), the most least restrictive shelter facility available, located in Mystic, Connecticut. The shelter in licensed by the State of Connecticut to provide residential care to children. As discussed below, J.S.R. receives a variety of case management, clinical, educational, and medical services at Noank.

### B.      Plaintiff V.F.B.'s Mother ("A.D.B.A")

A.D.B.A. is a native and citizen of El Salvador who entered the United States with her daughter, Plaintiff V.F.B., on or around May 13, 2018, and was encountered by the Rio Grande Valley, Texas Border Patrol Sector. A.D.B.A. was processed as an expedited removal. A.D.B.A.'s immigration proceedings are ongoing.

Plaintiff V.F.B. is a native and citizen of El Salvador who entered the United States with her mother on or around May 13, 2018. Plaintiff V.F.B. was processed as an UAC and served a notice to appear in EOIR. On May 14, 2018, Plaintiff V.F.B. was transferred to Noank. As discussed below, Plaintiff V.F.B. also receives a variety of case management, clinical, educational, and medical services at Noank.

### C.      Noank Community Support Services, Inc.

At Noank, all children in care, including Plaintiffs, receive certain mandatory mental and emotional health services, such as weekly individual counseling. *See* Declaration of James S. De

La Cruz, Senior Field Program Specialist Supervisor for the Office of Refugee Resettlement, an office within the Administration for Children and Families, Department of Health and Human Services, dated July 10, 2018, attached here to as Exhibit D, at ¶ 9. Topics of such counseling include (but are not limited to) adjustment, separation anxiety, trauma, peer/adult relationships, anger management, self-esteem, grief and loss, educational or vocational aspirations, and setting realistic expectations and goals. *Id.* The clinician working with each child conducts ongoing mental health assessments to identify any and all signs of mental illness. *Id.* Group therapy services are also offered to each child twice a week. Topics of such therapy include (but are not limited to) social anxiety, teamwork, adapting to life in the United States, bullying, problem solving, abuse or neglect, goal setting, and various independent living skills (time management, personal care, etc.). *Id.* If a child's clinical assessment indicates mental health concerns, a care provider, (Noank in this case), will seek outside resources and will make the necessary referrals for either a psychological or psychiatric evaluation, and/or psychotropic medication monitoring of the child. In addition, a medical provider screens each child to determine his or her individual mental health needs and/or treatment. *Id.* at ¶ 10.

III.    **APPLICABLE LEGAL FRAMEWORK**

   A.    **Criminal Prosecution**

Individuals in the custody of United States Department of Homeland Security's ("DHS") may be subject to criminal prosecution, either for criminal immigration violations or for other criminal violations. Notably, many of the immigration statutes that DHS enforces have criminal provisions, including but not limited to 8 U.S.C. §§ 1324, 1325, and 1326, giving DHS discretion to refer people to the U.S. Department of Justice ("DOJ") for prosecution based on the particularized facts and circumstances of an individual case. Furthermore, pursuant to an April

11, 2017 memorandum from the Office of the Attorney General, all qualifying individuals apprehended by United States Customs and Border Protection ("CBP") are referred to DOJ to consider prosecution under 8 U.S.C. §§ 1324, 1325, 1326, or for other criminal violations. Whether a person is prosecuted for these crimes after a referral by CBP is a decision made by DOJ, and is subject to that agency's prosecutorial discretion. *See U.S. v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.").

**B.**     **Reinstatement of Removal**

One category of adults who may be apprehended as part of a purported family unit is individuals who have previously been removed from the United States, but who then illegally reenter. DHS may "reinstate" a prior order of removal where it finds an individual "has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal." 8 U.S.C. § 1231(a)(5).   If an individual expresses a fear of returning to the country of removal, he/she is referred to U.S. Citizenship and Immigration Services ("USCIS") for an interview by an asylum officer to determine whether he/she possesses a "reasonable fear" of persecution or torture, a process similar to, but distinct from, the credible fear analysis for expedited removal.   *See* 8 C.F.R. § 208.31.   If the asylum officer determines that the individual has not established a reasonable fear of persecution or torture, he/she may request review of that determination by an immigration judge.   *See* 8 C.F.R. §§ 208.31(f); 1208.31(f).   If the immigration judge also finds that no reasonable fear of persecution or torture exists, the case is returned to DHS for execution of the reinstated order of removal, and no administrative appeal is available.   *See* 8 C.F.R. §§ 208.31(g)(1); 1208.31(g)(1).

If the asylum officer determines that the individual has established a reasonable fear of persecution or torture, the individual is referred to the immigration judge for consideration of withholding or deferral of removal only (aliens with reinstated orders of removal are not eligible for asylum). *See* 8 C.F.R. §§ 208.31(e); 1208.31(e). Because an individual's removal order remains administratively final throughout such "withholding-only" proceedings, 8 U.S.C. § 1231(a) continues to provide the statutory authority for his/her detention.

C.     **Expedited Removal**

Adult aliens who are seeking to enter the United States without any documentation allowing for their admission, including as part of a purported family unit, may be subject to a process commonly referred to as "expedited removal," which provides an accelerated removal process for certain aliens. *See* 8 U.S.C. § 1225(b); 69 Fed. Reg. 48,877 (Aug. 11, 2004). Congress has explicitly mandated the detention of individuals who are in the expedited removal process and whose claim of credible fear of persecution is still being considered, or who have been found not to have a credible fear of persecution. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.").

Individuals subject to such mandatory detention under expedited removal are eligible for release from immigration detention only if they are granted parole under certain limited criteria. *See* 8 C.F.R. §§ 235.3(b)(2)(iii); 235.3(b)(4)(ii) (parole of an alien's mandatory detention who is awaiting a credible fear determination or who has not expressed a fear of return "may be permitted only when the [Secretary of Homeland Security] determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective."); 8 U.S.C. § 1182(d)(5)(A) (DHS may, in its "discretion parole into the United States

temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . . .").  Thus, an alien who is subject to expedited removal, and who is seeking to establish that he or she has credible fear, is not subject to discretionary detention under 8 U.S.C. § 1226(a) and is ineligible for release on bond or a bond redetermination hearing before an immigration judge.

If a USCIS asylum officer interviews an individual in expedited removal proceedings and determines that he or she has a credible fear of persecution or torture, the individual may seek asylum or other protection from removal before an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. §§ 208.30, 235.3(b)(4).  If the asylum officer determines the individual does not have a credible fear of persecution or torture, the individual may request review of that determination by an immigration judge.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 208.30(g); 8 C.F.R. § 1003.42; 8 C.F.R. § 1208.30.  If the immigration judge determines that the individual does not have a credible fear of persecution or torture, he or she may be ordered removed from the United States.  8 U.S.C. § 1225(b)(1)(B)(iii); *see also* 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii); 8 C.F.R. § 1003.42(f) ("No appeal shall lie from a review of an adverse credible fear determination made by an immigration judge.").

If either the asylum officer or the immigration judge determines that the alien has a credible fear of persecution or torture, expedited removal proceedings are vacated and the alien is referred for removal proceedings before an immigration judge under 8 U.S.C. § 1229a.  *See* 8 C.F.R. § 208.30(f). However, even after an individual is found to have a credible fear, release from detention may still be limited.  Depending on the circumstances of the aliens' arrest, the alien may be either eligible for parole to meet a medical emergency or if necessary for a legitimate law

enforcement objective, *see* 8 C.F.R. §§ 235.3(b)(2)(iii) and 235.3(b)(4)(ii) or for bond, if the alien was detained for expedited removal as "certain other aliens" and can show "that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding," 8 C.F.R. § 236.1(c)(8); 8 C.F.R. § 1236.1; Matter of X-K-, 23 I. & N. Dec. 731 (2005).

### D.     The Original *Flores* Litigation

The original complaint in the *Flores* litigation was filed on July 11, 1985. The issue at the heart of the *Flores* litigation was the practices of the legacy Immigration and Naturalization Service ("INS") regarding unaccompanied minors in the INS's Western Region who were subject to removal and who were eligible for discretionary release from detention, but who could not be released because there was no immediately available custodian to whom the INS could release them. *See Reno v. Flores*, 507 U.S. 292, 294-95 (1993). The Government could not "simply send them off into the night on bond or recognizance" but instead needed to "assure itself that someone will care for those minors pending resolution of their deportation proceedings." *Id.* at 295. To address this problem, the INS's Western Regional Office "adopted a policy of limiting the release of detained minors to a parent or lawful guardian, except in unusual and extraordinary cases, when the juvenile could be released to a responsible individual who agree[d] to provide care and be responsible for the welfare and well-being of the child." *Id.* at 295-96 (quoting *Flores v. Meese*, 934 F.2d 991, 994 (9th Cir. 1990), *vacated*, 942 F.2d 1352 (9th Cir. 1991) (en banc)) (internal quotations omitted).

Plaintiffs' lawsuit challenged this policy and sought to compel the release of unaccompanied minors to non-parental guardians or private custodians. *Id.* at 302. Their lawsuit was brought on behalf of a certified class of minors "who [had] been, are, [were] denied release

from INS custody because a parent or legal guardian failed to personally appear to take custody of them."  Order Re Class Certification, Aug. 12, 1986; *see also Reno*, 507 U.S. at 296.  The original complaint asserted two claims challenging the INS's release policy related to unaccompanied minors, and five claims challenging detention conditions for unaccompanied minors not released. *Reno*, 507 U.S. at 296.

In 1993, the Supreme Court rejected Plaintiffs' facial challenge to the constitutionality of INS's regulation concerning care of juvenile aliens.  *Id.* at 305.

### E.     Relevant Provisions of The *Flores* Settlement Agreement

In 1996, the parties entered into the *Flores* Settlement Agreement to resolve the case, and it was approved by the court in 1997, a copy of which is attached hereto as Exhibit A.  The Agreement, in large part, addressed the procedures and practices that the parties agreed should govern the INS's discretionary decisions to release or detain these unaccompanied minors, and to whom they should or may be released.  *See* Agreement ¶¶ 14-18 (describing the general framework for release of unaccompanied minors from INS custody and the procedures and priorities for release).  The "general policy favoring release" provision of the Agreement provides the order of preference for the persons into whose custody these unaccompanied minors should be released.[3] The Agreement also addresses what to do in a situation where a minor cannot be released and must remain in the custody of the INS.  *See* Agreement ¶¶ 19-24.  In such a situation, the Agreement

---

[3] Specifically, the Agreement states the order of preference as follows: "A) a parent; B) a legal guardian; C) an adult relative (brother, sister, aunt, uncle, or grandparent); D) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship; E) a licensed program willing to accept legal custody; or F) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."  Agreement ¶ 14.

requires that the minor be placed in a licensed facility. Agreement ¶ 19. The Agreement further lays out the conditions that must be provided in any licensed facility in which a minor is held. In certain situations where a minor has committed certain crimes, or otherwise been determined to be a danger or an escape risk, the Agreement further allows that he or she "may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors . . . ." Agreement ¶¶ 21-22. A secure facility should not be used, however, if there is a less restrictive alternative such as a medium-security facility or another licensed program that is "available and appropriate in the circumstances . . . ." Agreement ¶ 23. The Agreement provides that for minors in immigration proceedings, a bond hearing should be provided in all cases unless waived by the minor. Agreement ¶ 24A. It also provides:

> Any minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit 1 attached hereto, may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1.

Agreement ¶ 24B.[4]

### F.    Changes in the Legal Framework Since the *Flores* Agreement

#### 1.    *The Homeland Security Act of 2002 ("HSA")*

In 2002, Congress enacted the HSA. Pub. L. No. 107-296, 116 Stat. 2135. The HSA created the U.S. Department of Homeland Security ("DHS"), transferring most immigration functions formerly performed by INS to the newly-formed DHS and its components, including

---

[4] The Agreement was originally set to expire within five years, but on December 7, 2001 the Parties agreed to a termination date of "45 days following defendants' publication of final regulations implementing this Agreement." Stip., Dec. 7, 2001. To date, no such regulations have been published.

U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and ICE.  *See also* Department of Homeland Security Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (also set forth as a note to 6 U.S.C. § 542).

Congress transferred to the U.S. Department of Health and Human Services ("HHS"), the responsibility for the care of UACs "who are in Federal custody by reason of their immigration status."  HSA § 462(a), (b)(1)(A); 6 U.S.C. § 279(a), (b)(1)(A).  The HSA defines an "unaccompanied alien child" as:

> a child who-
>
> (A) has no lawful immigration status in the United States;
>
> (B) has not attained 18 years of age; and
>
> (C) with respect to whom-
>
> (i) there is no parent or legal guardian in the United States; or
>
> (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

6 U.S.C. § 279(g)(2).  The HSA also transferred to HHS the responsibility for making all placement decisions for UACs, and required HHS to coordinate these placement decisions with DHS. Finally, the HSA prohibited HHS from releasing UACs on their own recognizance.  *See* 6 U.S.C. § 279(b)(l)(C), (D), (b)(2).

## 2.    Trafficking Victims Protection Reauthorization Act of 2008

The Trafficking Victims Protection and Reauthorization Act of 2008 ("TVPRA") was signed into law on December 23, 2008.  *See* Pub. L. No. 110-457.  The TVPRA confirmed that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services ("HHS")."  8 U.S.C. § 1232(b)(1).  An "unaccompanied alien child" ("UAC") is defined

as "a child who (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Under the TVPRA, unless there are "exceptional circumstances," any department of agency must transfer a UAC to the custody of HHS, Office of Refugee Resettlement ("ORR") within 72 hours of the agency's determination that a child in its custody is, in fact, a UAC. 8 U.S.C. § 1232(b)(3).

When a UAC is referred to ORR, the agency places the UAC with a care provider. *See* Office of Refugee Resettlement, ORR Policy Guide: Children Entering the United States Unaccompanied ("ORR Guide") § 3.1, available at: http://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last accessed April 20, 2018); *see also Flores* Settlement Agreement, attached hereto as Exhibit A (providing minimum standards for licensed programs.). The ORR intake staff makes an initial care provider placement decision for each UAC. *See* ORR Guide § 1.3.2. The majority of care providers operate one of three types of facilities: shelter-type facilities, staff secure facilities, or secure facilities. Id. § 1.1; *see also* Declaration of Jallyn N. Sualog, Acting Deputy Director for Children's Programs for the Office of Refugee Resettlement, an Office within the Administration for Children and Families ("ACF"), ("Sualog Decl."), ¶ 7, attached hereto as Exhibit B. Shelter care is a residential care facility in which all programs are administered on-site, in the least restrictive setting. *See* ORR Guide: Guide to terms; Sualog Decl. ¶ 7. Staff secure facilities maintain stricter security measures than shelters, such as a higher staff-to-UAC ratio for supervision and a secure perimeter with a "no climb" fence. ORR Guide: Guide to terms; Sualog Decl. ¶ 7. These facilities have a more shelter or home-like setting than secure detention, and do not have locked pods or cell units. ORR Guide: Guide to terms;

Sualog Decl. ¶ 7. Secure facilities are the most restrictive level of care. They are physically secure structures with staff who are able to control violent behavior and may be a licensed juvenile detention center or a highly structured therapeutic facility. ORR Guide: Guide to terms; Sualog Decl. ¶ 7.

When deciding placement, ORR places the child in the "least restrictive setting that is in the best interest of the child," subject to considerations of danger to self, danger to others, or risk of flight, in accordance with the TVPRA. 8 U.S.C. § 1232(c)(2)(A); *see also* Sualog Decl. ¶ 6. Shelter care is by far the most common type of placement for minors in ORR custody. *See* Sualog Decl. ¶ 7.

ORR also conducts ongoing assessments as to whether there is a suitable sponsor for each UAC in their care so that children may be released as quickly as is safe and appropriate. *See* ORR Guide § 2.2; Sualog Decl. ¶ 13. Under the TVPRA, where a proposed sponsor seeks to have a child released by ORR to his or her custody ORR must make "a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A); Sualog Decl. ¶ 13. This assessment reviews a potential sponsor's strengths, resources, risk factors, and special concerns within the context of the UAC's needs, strengths, risk factors and relationship to the sponsor. *See* ORR Guide § 2.4. A potential sponsor must fill out an application, the "family reunification package," provide identification documentation, and undergo a background check, along with any adult living in his or her household. *See* ORR Guide §§ 2.2.3, 2.5. Once the assessment of the potential sponsor is complete, the care provider makes a release recommendation. *See* ORR Guide § 2.7. ORR makes the final release decision. *See Id.*

### G. _Ms. L. v. ICE, et al_, Case No. 18-cv-428 (S.D. Cal.)

On June 26, 2018, the District Court for the Southern District of California certified a class in _Ms. L., et al v. ICE, et al_, Case No. 18-cv-0428 (S.D. Cal.), of which these Plaintiffs' parents have been deemed class members. The _Ms. L._ Court also granted a preliminary injunction motion that was based on a claim that the Government's separation of children from their parents violated the Fifth Amendment. _Ms. L., et al v. ICE, et al_, Case. No. 18-cv-0428 (S.D. Cal.). In granting class relief, and as relevant here, the Court's preliminary injunction order requires that class members be reunified with their children within 14 days (July 10, 2018) of the Court's order for children under 5, and within 30 days (July 26, 2018) of the Court's order for all other children. The Government is in the process of implementing the relief required by the Court's order, and as stated in its Objection to the Petition for Writ of Habeas Ad Testificandum, Docket No. 21, HHS/ORR fully intends to comply with this Order to the best of its ability.

### H. Implementation of the _Ms. L._ Order

HHS understands the _Ms. L_ Order to require three distinct findings before a child can be released. First, HHS must determine that the individual is the parent of the child with whom he or she seeks to be reunified.[5] Second, HHS must confirm that an individual is neither "unfit [n]or presents a danger to the child," is "available to provide care and physical custody," and that the parent "has not engaged in any activity that would indicate a potential risk to the child." 6 U.S.C. § 279(g)(2) and 8 U.S.C. § 1232(c)(3)(A). Third, before releasing any child to a class member

---

[5] Given the possibility of false claims of parentage, confirming parentage is critical to ensure that children are returned to their parents, not to potential traffickers. _See_ Declaration of Jonathan White, United States Public Health Service Commissioned Corps, Office of the Assistant Secretary for Preparedness and Response, dated July 5, 2018, at ¶ 25, Exhibit C.

who is not in government custody or to a sponsor, HHS must determine that the parent/sponsor is not "unfit [and does not] present a danger to the child." 8 U.S.C. § 1232.

### 1. Key HHS Actions On Reunification

The Secretary of Health and Human Services has directed HHS to take all reasonable actions to comply with the Court's orders and to prioritize child safety and well-being when doing so. *See* Declaration of Jonathan White, United States Public Health Service Commissioned Corps, Office of the Assistant Secretary for Preparedness and Response dated July 5, 2018, attached hereto as Exhibit C, at ¶ 3. On June 22, 2018, the Secretary of Health and Human services directed the Office of Assistant Secretary for Preparedness and Response ("ASPR") to deploy personnel and resources to help the office of Refugee Resettlement (ORR) of the Administration for Children and Families ("ACF") of HHS reunify children in ORR custody with parents. In addition to working with various agencies to determine class members, HHS has deployed field personnel to help putative class members communicate with children in ORR care. *Id.* at ¶ 6.

### 2. The Deployment of Additional Personnel

The activating of ASPR included the Secretary's Operation Center ("SOC"), which is a command center that operates 24 hours per day, 365 days per year. *Id.* at 8. The mission of the SOC is to synthesize critical public health and medical information for the U.S. Government. *Id.* While typically used for a public health emergency or natural disaster (e.g., Hurricane Maria in Puerto Rico), the SOC can also serve as a communications hub for large, data-intensive, inter-departmental operations. *Id.*

ASPR activated an Incident Management Team. *Id.* at ¶ 9. As of July 3, 2018, the Incident Management Team had 33 members (in addition to the permanent staff of the SOC). *Id.*

It works fulltime to provide logistical and administrative support.  *Id.*  ASPR has also dispatched approximately 1l5 personnel to the field to engage directly with putative class members in DHS custody.  *Id.*  at ¶  10.  Those personnel-who are organized into four field teams- are from ACF, ASPR, the US Public Health Service Commissioned Corps, and the National Disaster Medical System's Disaster Medical Assistance Team ("DMAT").  *Id.*  The DMAT is a cadre of trained health and medical professionals and para-professionals that augments ASPR's capabilities during public emergencies.  *Id.*

Lastly, HHS has executed a contract with BCFS Health and Human Services, Inc. ("BCFS"), to provide an additional 100 reunification case managers, plus approximately 40 staff for logistical and administrative support.  *Id.* at ¶  11.  HHS has trained the case managers from BCFS, and deployed them on Thursday, July 5, and Friday, July 6, 2018, to augment existing field operations.  *Id.*  They too will engage directly with putative class members in ICE custody.  *Id.*

### 3.  <u>Verifying Parentage</u>

HHS is using DNA testing to try to verify parentage of ***<u>all</u>*** putative class members, as well as all children in ORR custody who ORR reasonably believes were separated from a putative class member.  *Id.* at ¶  20.  HHS is conducting the DNA testing concurrent with collecting and reviewing documentation of parentage, interviewing putative class members and family members, and observing communications or interactions between putative class members and children.  *Id.*  DNA testing is a faster but costlier method for confirming parentage than collecting and assessing documentation and anecdotal information.  *Id.*  When ORR implements its safety and suitability policies in the ordinary course of administering its program, it confirms parentage through DNA testing as a last resort.  *Id.*  HHS has dual-tracked global DNA testing to

ensure child safety and to expedite parentage verifications so as to comply with the deadlines in the *Ms. L.* Court Order. *Id.*

ORR grantees are swabbing the cheeks of the children in ORR custody, while DHS personnel or the field teams deployed by HHS are swabbing the cheeks of the putative class members in ICE custody. *Id.* at ¶ 22. The cheek swabs are then sent to a third-party laboratory services provider to complete the DNA testing. *Id.* The results are then transmitted electronically to the Incident Management Team at the SOC, which shares them with the grantees. *Id.* HHS will use the results only for verifying parentage. *Id.*

The DNA testing process takes nearly one week to complete for each putative class member and child. *Id.* at ¶ 23. Once HHS has made a data match between a putative class member and child, it may take the field teams and grantees up to two days to further validate the match and check swabs. *Id.* It may then take up to three days for laboratory services provider to collect the sample and conduct the test. *Id.* Once the laboratory services provider completes the testing, it may take up to 24 hours for the Incident Management Team to receive and transmit the results back to the grantees and field teams. *Id.*

The field teams are concurrently facilitating the completion of reunification applications by putative class members. *Id.* at ¶ 24. The packets seek medical and social data that bear on the criteria for class membership, including parentage, parental fitness, and child endangerment. *Id.*

### 4. **Background Checks for Parental Fitness**

HHS is assessing the backgrounds of putative class members by reviewing summaries of prior criminal background checks provided by ICE. *Id.* at ¶ 27. Already such background check information has come back with two results that show that two putative parents of children

under five may endanger the child (charges of kidnapping/rape and child cruelty), and 12 more need to be further assessed. *Id.*

### 5. <u>Parental Fitness and Child Endangerment</u>

As discussed below, HHS' ordinary process for placing children with sponsors involves a safety and suitability analysis, as well as a home study in certain circumstances. *Id.* at ¶ 28. These checks can sometimes take weeks or months. *Id.* HHS has modified and expedited its ordinary process when further assessing parental fitness and potential child endangerment for a potential reunification with a putative class member in DHS custody. *Id.* at ¶ 29. For potential reunifications with putative class members in DHS custody, any further assessment of parental fitness and potential child endangerment involves only the review of the case management records (which includes, for example, case review notes and other electronic files) and the putative class member's completed reunification packet for indicia of child abuse or neglect. *Id.* If there are no such indicia then HHS will not conduct further assessment. *Id.*

When further assessing parental fitness and potential child endangerment for potential reunifications of putative class members who are no longer in DHS custody, which is not the case here, HHS is modifying and expediting its ordinary process on a case-by-case basis to try to comply with court-ordered deadlines in ways that do not endanger child welfare. *Id.* at ¶ 30. For example, when placing a child with a putative parental sponsor who is no longer in DHS custody, HHS would ordinarily verify the potential sponsor's residential address and conduct background checks of adult cohabitants to try to ensure that the potential sponsor is capable of providing shelter and care and that the potential sponsor's cohabitants do not endanger the child after placement. *Id.* at ¶ 31. To try to comply with the Court's deadlines, HHS will likely need to streamline its address verification process for putative class members. *Id.* But

HHS does not believe that it can streamline background checks absent a Court Order instructing it to do so. *Id.*

The Flores Settlement Agreement ("FSA), Exhibit A, prioritizes release to parents, if they are available, and also specifically provides for ORR to ensure the suitability of such releases, and to protect the child from danger. *See* FSA paragraphs 14- 18. *Id.* at ¶ 34. These factors include:

- Verifying the identity of the parent;

- Verifying the identity and employment of the individuals offering support to the parent and minor;

- Receiving information from their address and any future change of address;

- Ensuring the parent will provide for the minor's physical, mental, and financial wellbeing;

- Investigating the living conditions in which the minor would be placed and the standard of care he would receive;

- Interviewing the members of the household where the parent will live with the child, and in some cases a home visit; and

- Requiring the parent to ensure the minor's presence at all future immigration proceedings.

*Id.*

Furthermore, under the HSA and TVPRA, HHS has developed a series of safety and suitability requirements that ensure child welfare, upon release, is protected. *Id.* at ¶ 35. These policies, many of which were refined after Congressional oversight, are contained in Section 2 of the ORR Policy Guide: Children Entering the United States Unaccompanied, available at:

https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.1. *Id.* at 35.

The policies include identifying the sponsor; submitting the application for release

and supporting documentation; evaluating the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child; background checks; and in some cases home studies; and planning for post-release. *Id.* at 36. ORR requires all potential sponsors, including parents, to undergo fingerprinting in order to ensure the safety and suitability of release. *Id.* at ¶ 37. The fingerprints are used to run background checks of databases involving criminal history. *Id.* ORR also checks sexual abuse information, child abuse information, and other public record sources. *Id.*

ORR also requires that, if there are other adults living in the household with a sponsor (including a parent), those adults also undergo background checks. *Id.* at ¶ 38. This ensures the child will not be endangered if, for example, those household members have a history of child abuse or sexual abuse that ORR must further consider before approving the release. *Id.* ORR also requires that sponsors, including parents, identify an alternative caregiver, who will be able to provide care in the event the original sponsor is unavailable. *Id.* at ¶ 39. These adult caregivers must also be identified and undergo background checks. *Id.*

To ensure safety and suitability for children, ORR considers the following factors when evaluating release of a UAC to parents, other family members, and other potential sponsors in the community:

- The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.

- The sponsor's motivation for wanting to sponsor the child or youth.

- The UAC's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian is not the sponsor).

- The child or youth's views on the release and whether he or she wants to be released to the individual.

- The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.

- The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.

- The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's receipt of Legal Orientation Program for Custodians information that ORR provides to all potential sponsors.

- The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.

- The sponsor's strengths, resources and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns

- The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

*Id.* at 40.

In certain cases, the TVPRA requires a home study, prior to release. Tile 8 of the United States Code, Section 1232(c)(3)(B) states: "A home study shall be conducted for a child who is a victim of a severe form of trafficking in persons, a special needs child with a disability (as defined in section 12102 of title 42), a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened, or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence." *Id.* at ¶ 41. In circumstances in which a home study is not required by the TVPRA or ORR policy, the Case Manager and an independent third party Case Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to

determine that the sponsor is able to care for the health, safety and well-being of the child.  *Id.* at ¶ 41.

ORR does not disqualify potential sponsors on the basis of their immigration status, but does require sponsors (including parents) to complete a sponsor care plan.  *Id.* at ¶ 42. Among other things, the care plan identifies the adult caregiver who will act for the sponsor, should the sponsor become unavailable, and how such caregiver will be notified of such situation.  *Id.*   It also includes a safety plan in some circumstances.  *Id.*

Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs.  *Id.* at ¶ 43.  This involves working with the sponsor and the unaccompanied alien child to prepare them for post-ORR custody, assess the sponsor's ability to access community resources, and provide guidance regarding safety planning, sponsor care plans, and accessing services for the child. The care provider explains the U.S. child abuse and neglect standards and child protective services that are explained on hftps://www.childwelfare.gov, human trafficking indicators and resources, and basic safety and how to use the 9-l-l number in emergency situations.  *Id.*

Once the assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to:

> a.  Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.
>
> b.  Attend a legal orientation program provided under the Department of Justice/Executive office for Immigration Review's ("EOIR") Legal orientation Program for Custodians (Sponsors), if available where he or she resides.
>
> c.  Depending on where the unaccompanied alien child's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the child's

behalf. A "change of venue" is a legal term for moving an immigration hearing to a new location.)

d. Notify the DHS/USCIS within 10 days of any change of address by filing an Alien's Change of Address Card (AR-1 l) or electronically at http://wrwr.uscis.gov/ar--11 .

e. Ensure the unaccompanied alien child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement ("lCE") and the DOJ/EOIR.

f. Ensure the unaccompanied alien child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

g. Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)

h. Notify the National Center for Missing and Exploited Children at l-800-843-5678 if the unaccompanied alien child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)

i. Notify ICE at l-866-347-2423 if the unaccompanied alien child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)

j. In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the Sponsor Care Agreement.

k. In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied alien child and is unable to temporarily transfer physical custody, notify ORR using the ORR National Call Center, at 1-800-203 -7001.

*Id.* at ¶ 44.

## 6. <u>Facilitation Of Class Member Communications</u>

HHS has facilitated communication between putative class members by helping

putative class members connect with case managers.  *Id.* at ¶ 47.  HHS has directed field staff to

help facilitate a conversation between a putative class member and his or her child.  For example,

field staff may call a case manager in a minor's shelter and ask the case manager to call or

contact the detained parent.  *Id.*  In other instances, the detained adult may be given the shelter

case manager's telephone number.  *Id.*  HHS operates with the goal of facilitating

communications between putative class members and children in ORR custody twice a week.

## IV. ARGUMENT

### A. Plaintiffs' Request for an Additional Temporary Restraining Order or Preliminary Injunction should be Subject to a Heightened Standard Because Plaintiffs do not Seek to Preserve the Status Quo

As stated above, Plaintiffs and their parents are already the beneficiaries of a preliminary

injunction issued by the *Ms. L.* Court which requires reunification of Plaintiffs with their respective

parents by July 26, 2018.  Plaintiffs now seek an additional temporary restraining order or

preliminary injunction requiring either: 1) Plaintiffs release to sponsors, or 2) reunification with

their parents by July 13, 2018.  The issuance of a second preliminary injunction order would not

preserve the status quo.

The test for determining the propriety of a temporary restraining order and a preliminary

injunction is the same; the Court must determine whether the movant has shown "(1) that it is

subject to irreparable harm; and (2) either (a) that it will likely succeed on the merits or (b) that

there are sufficiently serious questions going to the merits of the case to make them a fair ground

for litigation, and that a balancing of hardships tips 'decidedly' in favor of the moving party."

*Genessee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997); *see also Fun–*

*Damental Too, Ltd., v. Gemmy Indus. Corp.*, 111 F.3d 993, 998–99 (2d Cir. 1997); *L. & J.G.*

*Stickley, Inc. v. Canal Dover Furniture Co.*, 79 F.3d 258, 261–62 (2d Cir. 1996); *Tough Traveler,*

*Ltd. v. Outbound Prods.*, 60 F.3d 964, 967 (2d Cir. 1996).  A preliminary injunction is "'is an

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consolidated Edison Co. of New York*, *Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

When an injunction's terms would alter, rather than preserve, the status quo by commanding some positive act, the injunction is mandatory and the moving party must meet a higher standard than in the ordinary case by showing "clearly" that he or she is entitled to relief or that "extreme or very serious damage" will result from a denial of the injunction. *Air Transp. Int'l Liab. Co. v. Aerolease Fin. Grp., Inc.*, 993 F. Supp. 118, 123 (D. Conn. 1998) (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)); *Jarecke v. Hensley*, 552 F. Supp. 2d 261, 264 (D. Conn. 2008) ("[i]f a party seeks a mandatory injunction, i.e., an injunction that alters the status quo by commanding the defendant to perform a positive act, he must meet a higher standard. [I]n addition to demonstrating irreparable harm, [t]he moving party must make a clear or substantial showing of a likelihood of success on the merits, ... a standard especially appropriate when a preliminary injunction is sought against government.") (quoting *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006) (citations omitted)); *St. Pierre v. Tawanna*, No. 14-CV-1866 (VAB), 2017 WL 1065021, at *4 (D. Conn. Mar. 20, 2017) ("If the movant seeks a mandatory injunction that alters the status quo by commanding a positive act," he or she "must meet a higher standard.") (citation omitted).

### B. Plaintiffs' Individual Actions Should Not Be Permitted To Interfere With The Orderly Administration Of The Class Claims In *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428 (S.D. Cal.)

As noted, on June 26, 2018, the District Court for the Southern District of California certified a class in *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428 (S.D. Cal.), of which Plaintiffs' parents are class members. The *Ms. L.* Court also granted a preliminary injunction

motion that was based on a claim that the Government's separation of children from their parents violated the Fifth Amendment.  *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428, ECF No. 83 (S.D. Cal.).  In granting class relief, and as relevant here, the Court's preliminary injunction order requires that class members be reunified with their children within 14 days of the Court's order for children under 5, and within 30 days of the Court's order for all other children. The Government is in the process of implementing the relief required by the Court's order.

This Court should not permit Plaintiffs' individual claims to go forward in this case where there is an ongoing class action that is based on the same constitutional claims relied on by Plaintiffs here and regarding which a preliminary injunction has already entered.  *See McNeil v. Guthrie*, 945 F.2d 1163, 1165-1166 (10th Cir. 1991) ("Individual suits for injunctive and equitable relief from alleged unconstitutional prison conditions cannot be brought where there is an existing class action.  To permit them would allow interference with the ongoing class action.") (citing *Long v. Collins*, 917 F.2d 3, 4-5 (5th Cir. 1990); *Goff v. Menke*, 672 F.2d 702, 704 (8th Cir. 1982)); *see also Kidd v. Andrews*, 340 F. Supp. 2d 333, 335-337 (W.D.N.Y. 2004) ("As between federal district courts . . . the general principle is to avoid duplicative litigation.") (quoting *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976)).

Allowing these individual claims would interfere with the administration of the *Ms. L.* class action by that district court, and would create the risk of conflicting orders on the same claims.  *See Gillespie v. Crawford*, 858 F.2d 1101, 1103 (5th Cir. 1988) (en banc) (concluding that to allow individual suits would interfere with the orderly administration of a pending class action and risk inconsistent adjudications).

Where parallel, overlapping litigation is instituted and a certified nationwide class action case is already underway, multiple doctrines of comity direct that dismissal, transfer, or holding a case in abeyance are appropriate "to avoid the waste of duplication, to avoid rulings which may trench upon the authority of other courts, and to avoid piecemeal resolution of issues that call for a uniform result." *See, e.g.*, *Panasonic Corp. v. Patriot Sci. Corp.*, No. 05-cv-4844, 2006 WL 709024 at *2 (N.D. Cal. Mar. 16, 2006). *See also Gillespie,* 858 F.2d at 1103 (5th Cir. 1988) ("To allow individual suits would interfere with the orderly administration of the class action and risk inconsistent adjudications"). This is a special concern where indispensable parties (here, the parents of separated children—the actual individuals allegedly harmed) are already bringing a nationwide action on behalf of a certified class and that class was certified on June 26, 2018, before this case was even filed. And because *Ms. L.* has been proceeding for nearly five months, the first-to-file rule favors either dismissal or transferring the case with respect to the identical claims. Similar concerns lie at the heart of the Supreme Court's decision in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817 (1976), and the Supreme Court stated "[a]s between federal district courts ... the general principle is to avoid duplicative litigation." *Id.*; *see also United States v. Morros*, 268 F.3d 695, 706 (9th Cir. 2001) (noting the "chief concern [i]s with avoiding piecemeal litigation").

Denial of Plaintiffs' request for a temporary restraining order or second preliminary injunction is appropriate here because of the substantial overlap with *Ms. L.* Duplicative litigation is disfavored in the federal courts because of the risk of inconsistent judgments, as well as the waste of the parties' and judicial resources. *See, e.g.*, *Barapind v. Reno*, 225 F.3d 1100, 1109 (9th Cir. 2000) ("While no precise rule has evolved, the general principle is to avoid duplicative litigation[.]" (citations omitted)). In achieving the goals of coordination and

consolidation of cases that raise the same issues, the Supreme Court has said that "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of [duplicative litigation] problems. The factors relevant to wise administration here are equitable in nature." *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183–84 (1952). This is particularly so in the context of class actions that have already been certified under Federal Rule of Civil Procedure 23(b)(2), where complete relief is to be granted on a class-wide basis. *See* Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2)'s purpose is to permit *uniform* relief to be granted to the class as a whole, given that "[t]he primary goal[] of class action lawsuits [is] to avoid a multiplicity of actions and the risk of inconsistent or conflicting adjudications." *Newburg on Class Actions* § 10:33 (5th ed.); *see Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 599 U.S. 393, 402 (2010) (Rule 23 is designed to "further procedural fairness and efficiency").

Multiple courts of appeals have upheld dismissals (normally without prejudice) of a case if there is a parallel class action raising the same or substantially similar issues. *See e.g.*, *Crawford*, 599 F.2d at 892–93 (holding that a district court may dismiss "those portions of [the] complaint which duplicate the [class action's] allegations and prayer for relief"); *McNeil v. Guthrie,* 945 F.2d 1163, 1165–66 (10th Cir. 1991) (finding that individual suits for injunctive and declaratory relief cannot be brought where a class action with the same claims exists); *Horns v. Whalen,* 922 F.2d 835, 835 & n.2 (4th Cir. 1991); *Gillespie*, 858 F.2d at 1103 (once a class action has been certified, "[s]eparate individual suits may not be maintained for equitable relief"); *Bennett v. Blanchard,* 802 F.2d 456, 456 (6th Cir. 1986) (affirming dismissal of a case when the plaintiff was a member in a parallel class action); *Goff v. Menke*, 672 F.2d 702, 704 (8th Cir. 1982) (since class members generally "cannot relitigate issues raised in a class action

after it has been resolved, a class member should not be able to prosecute a separate equitable action once his or her class has been certified"); *accord Newberg on Class Actions* § 10:33 (5th ed.) ("If the goals of the class suit are to be achieved, it is generally beneficial for the multiple related actions to be coordinated or consolidated in some fashion.").  Applied to this case, any decision by this Court on the same claims in *Ms. L.* risks the creation of inconsistent judgments, causing confusion and potentially inconsistent treatment among class members, defeating the purpose of uniform prosecution and resolution of these claims via the class action vehicle. *See Pride v. Correa,* 719 F.3d 1130, 1137 (9th Cir. 2013) ("[T]he avoidance of concurrent litigation and potentially inconsistent results justifies dismissal[.]"); *Gillespie*, 858 F.2d 1103 (concluding that allowing individual suits would interfere with the orderly administration of a pending class action and risk inconsistent adjudications).

The *Ms. L.* Court has ordered preliminary relief on behalf of the class, including Plaintiffs' parents and as discussed in Section III.H. *supra.,* Defendants have already undertaken extensive efforts towards compliance with the preliminary injunction order.  *See* Declaration of Jonathan White, attached hereto as Exhibit C.  An order from this Court issuing conflicting relief for Plaintiffs would interfere with the implementation of the relief already ordered by the *Ms. L.* court, which already provides Plaintiffs the relief they are seeking from this Court.  Defendants note that one of the reasons *Ms. L.* granted class certification in the first place was to avoid this type of piecemeal litigation.  Accordingly, this Court should decline to order the relief sought by Plaintiffs in this case, and should require Plaintiffs to proceed as part of the class in the *Ms. L.* case.

## C.     The Plaintiffs are Receiving and Will Continue to Receive Excellent Care, Including All Medical Care Necessary, While at Noank

Plaintiffs argue that a temporary restraining order or a second preliminary injunction should issue requiring either Plaintiffs 1) release to a sponsor; or 2) reunification by July 13, 2018, because they suffer from PTSD as a result of events endured in their home countries prior to coming to the United States and due to their separation from their parents.

With respect to their claims for immediate release to a sponsor, Plaintiff J.S.R. has not had a sponsorship application submitted on his behalf. *See* Exhibit D at ¶ 17. Additionally, Plaintiff V.F.B.'s sponsor just submitted a sponsorship application on her behalf on the evening of July 9, 2018. *See* Exhibit D at ¶ 18. This application, however, was not complete as it did not include a consent form executed by V.F.B's mother indicating her consent to transfer the care and custody of her minor daughter to a sponsor. *Id.* Without completed applications and parental consent, the Defendants cannot release the Plaintiffs to a sponsor, *see* Section III.H *supra.*

The Defendants do not dispute Plaintiffs' allegation that their separation from their parents was, and remains, traumatic. Instead, the Defendants maintain that the Plaintiffs are receiving excellent care, both medical and otherwise, in the most least restrictive environment available. Defendants are also willing to comply with any reasonable accommodation requests made on behalf of the children. Notably, to date, the Defendants have received no accommodation requests relating to providing care to the Plaintiffs.

The Defendants respectfully note that the Noank Community Support Services, located in the coastal town of Mystic, Connecticut, was awarded its first ORR grant in 2014 as a shelter that served primarily pregnant UACs and minor UACs who were parents. *See* Declaration of James Da La Cruz, attached hereto as Exhibit D at ¶ 6. In February 2017 Noank was awarded a

second grant to service 12 UAC's. *Id.* at  6.  This grant was for males, females, pregnant and parenting, and sibling groups. *Id.*  The shelter has been consistently full since it became operational in March 2017. *Id.*  Noank is licensed by the State of Connecticut to provide residential care to children. *Id.* at ¶  4.

Noank is set up much like a group home and is located near the Mystic River. *Id.* at ¶  6. The shelter has 6 bedrooms, a kitchen, and 2 livings rooms. *Id.*  There is a large yard that the children use for recreational purposes such as a range of sports and holiday barbeques. *Id.* Noank is staffed with a teacher, medical coordinator, clinician, case manager, supervisor, director as well as 8 youth care workers. *Id.* at ¶  7.  The children attend school  Monday through Friday from 9 a.m. to 3:00 p.m. *Id.*  The children engage in a variety of recreational activities daily at local parks in the community or at the local YMCA. *Id.*  Plaintiff J.S.R. is an active 9-year old boy who loves playing soccer. *Id.* at ¶  4.  Plaintiff J.S.R. is also a great artist and is constantly surprising his therapists with pictures he has drawn. *Id.*  Plaintiff V.F.B. is a 14-year old girl who enjoys spending time talking with the other teenage girls on the grounds at the shelter, doing art projects, and shooting hoops on the basketball court. *Id.* at ¶  5. Plaintiffs have enjoyed taking part in all of these activities. *Id.* at ¶ 7.

Noank works in collaboration with the Community Health Centers in Groton and New London, Connecticut to provide medical care. *Id.* at ¶ 8.  Both Plaintiffs have been medically screened, received required vaccinations, and are in excellent health. *Id.*   Neither Plaintiff  is taking any medication, and the medical coordinator has not reported any concerns that the children have any mental health conditions which warrant psychiatric treatment or psychotropic medications. *Id.*

At Noank, all children in care, including Plaintiffs, receive certain mandatory mental and emotional health services, such as weekly individual counseling. *Id.* at ¶ 9. Topics of such counseling include (but are not limited to) adjustment, separation anxiety, trauma, peer/adult relationships, anger management, self-esteem, grief and loss, educational or vocational aspirations, and setting realistic expectations and goals. *Id.* The clinician working with each child conducts ongoing mental health assessments to identify any and all signs of mental illness. Group therapy services are also offered to each child twice a week. *Id.* Topics of such therapy include (but are not limited to) social anxiety, teamwork, adapting to life in the United States, bullying, problem solving, abuse or neglect, goal setting, and various independent living skills (time management, personal care, etc.). *Id.* Plaintiffs also frequently "pop-in" spontaneously and unannounced to say hello to their therapist at Noank even when they do not specifically have a session scheduled. *Id.*

If a child's clinical assessment indicates mental health concerns, a care provider such as Noank will seek outside resources and will make the necessary referrals for either a psychological or psychiatric evaluation, and/or psychotropic medication monitoring of the child. *Id.* at ¶ 10. In addition, a medical provider screens each child to determine his or her individual mental health needs and/or treatment. *Id.* The mental health clinician for Plaintiffs has reported that she has does not have specific concerns that the children need any mental health services beyond what is provided on-site at Noank, and as noted, the children have not been identified as needing any psychotropic medication. *Id.*

At the request of and paid for by Plaintiffs' legal counsel, however, Plaintiffs did engage in outside psychiatric evaluations through the Children's Psychiatric Inpatient Service at Yale-New Haven Children's Hospital on July 1, 2018. *Id.* at ¶ 11. ORR was only provided a copy of

these evaluations of the children pursuant to the instant litigation. *Id.* ORR has shared those evaluations with clinical staff at Noank to ensure that Plaintiffs' mental health needs are fully known and that they receive appropriate care and services. *Id.*

To the best of Defendants' knowledge, neither Plaintiffs nor their counsel have never made a request for reasonable accommodations for the children under the Americans with Disabilities Act based on a diagnosed disability of Post-Traumatic Stress Disorder (PTSD) prior to filing their complaints. *Id.* at 12. Since the filing of the instant complaints, moreover, the Plaintiffs' counsel have not sought medical treatment for the Plaintiffs or the scheduling of continued trauma-informed psychotherapeutic interventions, as was recommended by the doctors at Yale in their evaluations of the children. *Id.* As noted, however, trauma-informed therapeutic interventions are provided by Noank onsite at the shelter for all the UAC that it serves, and for Plaintiffs in particular. *Id.*

However, in light of reports from the Yale evaluators of the children's diagnosis of PTSD, which was only made known to ORR and Noank through this litigation, the Noank mental health clinician and Case Manager have scheduled Plaintiffs for medical follow up appointments this week in order to obtain referrals to additional mental health providers if deemed necessary. *Id.* at ¶ 13. The clinician has developed a detailed treatment plan for each child as it pertains to his or her mental health. *Id.* Lastly, the care provider scheduled a follow-up appointment with the medical provider working with the program to further assess the possible need for medication and other preventive or supportive mental health services. *Id.*

Per the observations of the mental health clinician working directly with Plaintiffs, neither child has demonstrated severe emotional distress or physical reactions as a result of being separated from their parents. *Id.* at ¶ 14. There are likewise no recent reports of nightmares,

flashbacks, or depressed mood. *Id.* The mental health clinician also reports that the Plaintiffs do not present psychiatric symptomatology which would warrant the prescription of psychotropic medication for treating mental illness. *Id.* While the Plaintiffs at times are appropriately sad and tearful when they speak to their respective parents, and would, of course, like to be reunified with their parents or another relative as soon as possible, they are now adjusting well to life at Noank and have expressed some joy and happiness in taking part in ordinary recreational activities provided for the children at the shelter. *Id.* The Plaintiffs' mental health clinician has spoken with the Plaintiffs' parents in order to assure them that, while they are housed at Noank and awaiting reunification with a parent or release to a relative sponsor, the children are being well cared for at the shelter. *Id.* The clinician has been able to convey information to the parents about the children's well-being and their daily activities. *Id.*

While being cared for at Noank, Plaintiffs have been able to communicate regularly by telephone with their parents who are detained by Immigration and Customs Enforcement ("ICE") in the State of Texas. Exhibit D at ¶ 15. Specifically, Plaintiff J.S.R. has spoken to his father by phone or video conference on the following dates: June 27, 28; and July 2, 4, 5 (2 times), 9, and 10. *Id.* Plaintiff V.F.B. has spoken by phone with her mother, on the following dates: June 21; and July 2, 5, 6, 9, and 10. *Id.*

Also in accordance with the TVPRA, ORR follows the same release policy and procedures before releasing any UAC to a parent or any other sponsor. *Id.* at ¶ 16. ORR policy requires the timely release of UAC to qualified parents, guardians, relatives, or other adults, referred to collectively as "sponsors." ORR Guide § 2.1 (Summary of Safe and Timely Release Process). *Id.* Consistent with the TVPRA's mandate, see 8 U.S.C. § 1232(c)(3)(A), ORR evaluates the ability of any potential sponsor, including the child's parent or another relative, to

provide for the child's physical and mental well-being, in order to protect him or her from "smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity." ORR Guide § Section 2.1. According to ORR policy: "The process for the safe and timely release of an unaccompanied alien child from ORR custody involves many steps, including: the identification of sponsors; the submission by a sponsor of the application for release and supporting documentation; the evaluation of the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child, background checks, and in some cases home studies; and planning for post-release." *Id.* While ORR's preference is to release a child to an appropriate sponsor who is verified to be the child's parent (see ORR Guide § 2.2.1), each of these steps apply to all sponsors prior to release, including parents, regardless of whether or not they were separated at the border from their children, as well as to any other relatives who may seek to sponsor a child. *Id.*

Although Plaintiff J.S.R.'s parental aunt[6] was made aware on June 16, 2018 of the need to submit a sponsorship package, this aunt has failed to follow up to obtain and complete a sponsorship application since that time. *Id.* at ¶ 17. Plaintiff J.S.R.'s mother also provided contact information for her sister who expressed an interest in sponsoring Plaintiff but There are no other potential sponsors who have stepped forward to indicate a desire to care for J.S.R. *Id.* Two of Plaintiff V.F.B.'s maternal aunt has expressed an interest in sponsorship, and her mother has not yet indicated whether she would like to support either aunt in pursuing sponsorship of Plaintiff V.F.B. *Id.* at ¶ 18. One of Plaintiff V.L.B.'s aunts submitted a sponsorship application

---

[6] In response to the Petition for Writ of Habeas Ad Testificandum, ORR mistakenly declared that it was Plaintiff J.S.R.'s uncle that was made aware of the sponsorship package and failed to follow up. However, it was a paternal aunt, and not uncle, who ORR discussed sponsorship with.

yesterday, July 9, 2018. *Id.* However, this application is incomplete because Plaintiff V.F.B's mother has not yet decided whether to sign a consent form in support of the application. *Id.*

Plaintiffs should be allowed to remain in this residential facility until their reunification with their parents – which is to happen no later than July 26, 2018, pursuant to the existing order in the already certified class action. In fact, as set forth in the Defendants' Opposition to Plaintiffs' Motion for Writ of Habeas Ad Testificandum, agents were working on Plaintiff J.S.R.'s reunification with his father prior to the filing of this litigation and the agents have continued working on this process

## V.    Conclusion

For the reasons set forth above, the Defendants request that Plaintiffs' Motion for a Temporary Restraining Order or a Second Preliminary Injunction be denied. The Defendant respectfully submits that it should be allowed to continue to work to comply with the deadline set by the *Ms. L.* Court Order – a deadline they intend to meet.

Respectfully submitted,

John H. Durham
United States Attorney


_____*/s/*_____
Michelle L. McConaghy, ct27157
Assistant United States Attorney
157 Church Street
New Haven, CT 06510
Telephone: (203) 821-3700
Fax: (203) 773-5373
Email: Michelle.McConaghy@usdoj.gov

## **CERTIFICATION OF SERVICE**

      I hereby certify that on July 10, 2018, a copy of the foregoing Opposition was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


          /s/
_____

Michelle L. McConaghy
Assistant U.S. Attorney